**Liani J. Reeves, OSB No. 013904**
lreeves@bullardlaw.com
**Kalia J. Walker, OSB No. 154434**
kwalker@bullardlaw.com
Bullard Law
200 SW Market Street, Suite 1900
Portland, OR  97201
503-248-1134/Telephone
503-224-8851/Facsimile

Attorneys for Defendants University of Oregon and Yue Fang

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **DR. YONGLI ZHANG,** | Case No. 6:18-cv-00232-MK |
| Plaintiff, | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **UNIVERSITY OF OREGON, and YUE FANG,** | **Oral Argument Requested** |
| Defendants. | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1, counsel certifies they conferred with Plaintiff's counsel and were unable to resolve the issues presented in this motion.

///

///

Page i    DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW (FRCP 56)

## MOTION

Pursuant to Fed. R. Civ. Pro. 56, Defendants University of Oregon and Yue Fang move for summary judgment against Plaintiff's Complaint and on each of Plaintiff's claims. This Motion is supported by the memorandum, cases and authorities, the *Declaration of Liani Reeves* ("Reeves Dec."), and the *Declaration of Yue Fang* ("Fang Dec.").

# Table of Contents

I.    MEMORANDUM OF LAW ..................................................................................1

    A.    INTRODUCTION.................................................................................1

    B.    RELEVANT BACKGROUND ...........................................................2

        1.    Factual Background ..............................................................2

        2.    Allegations Against Dr. Fang ............................................15

        3.    Procedural Background ......................................................18

    C.    SUMMARY JUDGMENT STANDARD.....................................19

    D.    ARGUMENT......................................................................................19

        1.    Jurisdictional Issues ..........................................................19

        2.    Count I: Race and National Origin Discrimination - Title VII and ORS 659A.030 Against University ...................................... 22

        3.    Count II: Retaliation - Title VII and ORS 659A.030 Against University ...................................................................... 29

        4.    Count III: Race and National Origin Discrimination Claims - 42 U.S.C. 1981 and 1983 Against University and Dr. Fang........ 31

        5.    Count IV: Whistleblower Retaliation - ORS 659A.203 Against University.....................................................................35

        6.    Count V: Breach of Contract - Against University.................... 36

    E.    CONCLUSION........................................................................ 38

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ................................................................................................................................... 19

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ................................................................................................................................... 19

*Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) ......... 35

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62, 126 S. Ct. 2405, 2411–12, 165 L. Ed. 2d 345 (2006) ....................................................................................................... 37

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1060–61 (9th Cir. 2011) ...................................................................................................................................... 27

Celotex Corp. v. Catrett, 477 U.S. 317, 323-4, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) .... 19

*Chaudhary v. Telecare Corp.*, 2000 WL 1721075, at *6 (N.D. Cal. Nov. 12, 2000) ........ 31

*Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) ........................................................................................................................ 33

*Coghlan v. American Seafoods Co. LLC,* 413 F.3d 1090, 1094–95 (9th Cir.2005) ........ 29

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) .......... 23, 24

*Craig v. County of Los Angeles*, 626 F.2d 659 (9th Cir. 1980) ........................................ 39

*Davis v. Oregon State Univ.*, 591 F.2d 493, 496 (9th Cir. 1978) ..................................... 41

*Delaware State Coll. v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). 20, 21

*Goberman v. Washington Cty.*, 2001 WL 34045881, at *10 (D. Or. Apr. 26, 2001) ...... 30

*Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir. 1998) ................................ 30

*Grossman v. City of Portland*, 33 F.3d 1200, 1208 (9th Cir. 1994) ................................... 36

*Hariri v. Portland State Univ.*, No. 3:15-CV-1076-PK, 2017 WL 826961, at *11 (D. Or. Mar. 2, 2017) ....................................................................................................................... 34

*Houston v. Univ. of Oregon*, No. CIV. 02-6288-TC, 2004 WL 1612950, at *4 (D. Or. Feb. 25, 2004) ....................................................................................................................... 34

*Laborde v. Regents of Univ. of California,* 686 F.2d 715, 718 (9th Cir. 1982) ............... 29

*Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1091 (D. Or. 2015) ..... 39

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ................................................................................................................................... 24

*McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1121 (9th Cir.2004) ................................. 23

*Neighorn v. Quest Health Care,* 870 F.Supp.2d 1069, 1102 (D.Or.2012) ...................... 39

*Orr v. City of Eugene*, 151 Or. App. 541, 543, 950 P.2d 397, 398 (1997) ......................... 22

*Pittman v. Oregon, Employment Dep't*, 509 F.3d 1065, 1071 (9th Cir. 2007) ............... 35

*Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) .................................................. 26

*Pool v. VanRheen*, 297 F.3d 899, 909-10 ........................................................................... 23

*Portland State University Chapter of the AAUP v. Portland State University*, 352 Or. 697 (2012) ........................................................................................................................... 21

*Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) ................................................... 32

*Reichle v. Howards*, 566 U.S. 658, 664 (2012) .................................................................. 38

*Reid v. Evergreen Aviation Ground Logistics Enterprises Inc.*, No. 07-1641-AC, 2009 WL 136019, at *7 (D. Or. Jan. 20, 2009) .............................................................................. 23

*Rounds v. Oregon State Bd. of Higher Educ.*, 166 F.3d 1032, 1035 (9th Cir. 1999) ....... 34

*Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) ............. 36

*Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613, 107 S. Ct. 2022, 2028, 95 L. Ed. 2d 582 (1987) ............................................................................................................................ 36

Page iv   DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND
              MEMORANDUM OF LAW (FRCP 56)

*Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996) 41, 42

*Staples v. Dep't of Soc. & Health Servs.*, 2009 WL 412920, at *1 (W.D. Wash. Feb. 17, 2009) ................................................................................................................... 35

*Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011) .............. 28

*Taylor v. Barkes*, 135 S. Ct. 2042, 2044, 192 L. Ed. 2d 78 (2015) ................................... 36

*Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004) .................................... 31

*Tyree v. Tyree,* 116 Or. App. 317, 320, 840 P.2d 1378 (1992), *rev. den.* 315 Or. 644, 849 P.2d 525 (1993) ................................................................................................................. 22

*Vasquez v. County of L.A.,* 349 F.3d 634, 641 (9th Cir.2004) ......................................... 30

*Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054,1062 (9th Cir. 2002) ...... 28, 29, 32, 33

*Wallis v. J.R. Simplot Col.,* 26 F.3d 885, 889 (9th Cir. 1994) ......................................... 29

*Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ................... 39

*Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989) .................................. 34, 35

*Woods v. Washington*, 475 F. App'x 111, 112 (9th Cir. 2012) ......................................... 38

**Statutes**

42 U.S.C. § 1983 ................................................................................................................ 33

42 U.S.C. § 2000e-2 .......................................................................................................... 37

42 U.S.C. § 2000e–2(a)(1) (2005) ..................................................................................... 23

42 USC § 2000e-3(a) ......................................................................................................... 31

659A 030 ............................................................................................................................ 21

*Chudacoff v. Univ. Med. Ctr. of S. Nevada*, 649 F.3d 1143, 1149 (9th Cir. 2011) ............ 34

Fed. R. Civ. Pro. 56 .............................................................................................................. ii

Fed. R. Civ. Proc. 56(c) ..................................................................................................... 19

ORS § 659A.203 ................................................................................................................ 39

ORS 30.275(2)(b) .............................................................................................................. 22

ORS 659A.030(1)(f) ........................................................................................................... 31

ORS 659A.875(1) ............................................................................................................... 20

*Peters v. Lieuallen*, 746 F.2d 1390, 1393 (9th Cir. 1984) ............................................... 37

### I.    MEMORANDUM OF LAW

**A.    INTRODUCTION**

Plaintiff's claims boil down to an allegation that he was denied tenure at the University of Oregon because his former colleague, Dr. Yue Fang, discriminated and retaliated against him during his tenure review process because Plaintiff did not act sufficiently Chinese. The University and Dr. Fang deny that. But even if Dr. Fang wanted to discriminate and retaliate against Plaintiff, there is no evidence that Dr. Fang could or did affect the decision to deny Plaintiff tenure.  That is because there are multiple levels of independent review before the Provost makes the ultimate decision based on the merits of a tenure applicant's file.  Plaintiff's tenure review included the following: an independent Department recommendation; an independent Department Head recommendation; an independent College recommendation, an independent Dean's recommendation; an independent University committee recommendation; and finally, an independent decision by the Provost. Dr. Fang was on the first level of review, and one of 23 people who made recommendations regarding Plaintiff's tenure application before the Provost denied tenure.

In sum, Plaintiff cannot show discrimination or retaliation for the following reasons. First, Plaintiff admitted he has no evidence of race or national origin discrimination. Rather, he speculates that he must have been the victim of discrimination and retaliation because, in his mind, there is a "lack of other evidence" to explain the tenure denial. That is not sufficient to establish discrimination. Second, Plaintiff admitted he raised no allegations of discrimination until *after* the Provost denied tenure. Further, the alleged retaliation is based on events that occurred *years* before Plaintiff's tenure review began. That is not sufficient to establish retaliation.

Page 1    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff's claims are untimely and have jurisdictional flaws. Accordingly, none of his claims should survive summary judgment.

## B.   RELEVANT BACKGROUND

### 1.   Factual Background

*Dr. Yue Fang*

      Dr. Yue Fang was born and educated in China. Fang Dec., ¶¶ 2-3. He came to the United States and completed his academic training at Massachusetts Institute of Technology. In 1996, he was hired as an Assistant Professor in the University of Oregon ("University") Lundquist College of Business ("LCB") Operations and Business Analytics ("OBA") Department.[1] *Id.* ¶ 5. He applied for tenure in 2001 and was promoted to Associate Professor with tenure in 2002. *Id.*  He served as OBA Department Head from 2010-2014. *Id.*

*Dr. Yongli Zhang*

      Dr. Yongli Zhang ("Plaintiff") was born and educated in China. Reeves Dec., Ex. 1 (Pl. Dep. 13:2-3; 23:15-21). In 2000, he came to the U.S. *Id.* (Pl. Dep. 13:4-14; 16:15-17). He received Statistics degrees from Ohio State (Masters 2003) and the University of Minnesota (Ph.D. 2007). *Id.* (Pl. Dep. 13:17-21). Plaintiff worked as a statistician data scientist at Edison Mission Marketing & Trading before he began considering academic jobs in 2008.  *Id.* (Pl. Dep. 25:19-26:9; 28:16-29:10).

*2009: Plaintiff started as Visiting Professor*

---

[1] The department was previously "Decision Sciences." It will be referred to by its current name, Operations and Business Analytics or "OBA."

Plaintiff was hired as a Visiting Professor of Statistics in the OBA Department to teach during Academic Year ("AY") 2009-2010. Reeves Dec., Ex. 2 (UO1159-1160). Although that was not a tenure track position, Plaintiff expected to have the opportunity to compete for a tenure track position. Reeves Dec., Ex. 1 (Pl. Dep. 44:17-45:17). Plaintiff signed a Notice of Appointment and Contract which included an agreement to comply with all University rules and policies. *Id.* (Pl. Dep. 60:2-15; 60:23-61:9); Ex. 3 (UO1154).

*2010: Plaintiff started tenure track position*

Plaintiff applied for and was hired for a tenure track position as an Assistant Professor of Statistics in the OBA in December of 2009. Reeves Dec., Ex. 4 (Zhang15-19); Ex. 5 (Zhang_DS191-193). The Provost informed Plaintiff he would be considered for tenure during AY 2015-2016. Reeves Dec., Ex. 1 (Pl. Dep. 82:15-24); Ex. 5 (Zhang_DS191-193). Plaintiff again signed a Notice of Appointment and Contract which included an agreement to comply with University rules and policies. Reeves Dec., Ex. 1 (Pl. Dep. 83:8-18).

When Plaintiff started at the University, the OBA Department's tenured faculty included: Dr. Sergio Koreisha, Dr. Nagesh Murthy, Dr. Michael Pangburn, and Dr. Fang. Fang Dec. ¶ 6. Plaintiff, Dr. Fang, and Dr. Koreisha were statisticians. *Id.* ¶ 7. Dr. Koreisha was the Department Head until he moved into the LCB Dean's Office and Dr. Fang became Department Head in 2010. *Id.* Dr. Koreisha returned as Department Head in 2014 and remained so through Plaintiff's employment. *Id.;* Reeves Dec., Ex. 1 (Pl. Dep. 59:12-23).

*The Tenure Process*

Receiving tenure is essentially an award of lifetime employment, and such an award is not guaranteed. Reeves Dec., Ex. 6 (Coltrane 30b6 Dep. 12:24-13:3). Plaintiff acknowledges not all professors earn tenure. Reeves Dec., Ex. 1 (Pl. Dep. 113:18-114:4). University and LCB policies and the Collective Bargaining Agreement between University and United Academics, AAUP ("CBA") outline tenure standards and processes. Reeves Dec., Ex. 7 (Zhang757-759); Ex. 8 (UO1603-1607); Ex. 9 (Zhang_DS48, 87-99). Within the University, tenure standards differ across colleges. Reeves Dec., Ex. 1 (Pl. Dep. 118:11-24).

The LCB requires Assistant Professors to achieve high quality teaching, service, and scholarship, "actively pursu[ing] scholarly research and to publish their findings in the leading refereed journals in their field." Reeves Dec., Ex. 10 (Zhang_DS352). Assistant Professors should also attend/present their scholarship at professional meetings and interact with their colleagues to advance knowledge in the field. *Id.* LCB's promotion and tenure policy outlines requirements in the three areas evaluated for tenure—research, teaching, and service ("LCB Tenure Policy"). Reeves Dec., Ex. 1 (Pl. Dep. 119:17-23); Ex. 6 (Coltrane 30b6 Dep. 24:21-25:3); Ex. 7 (Zhang757-759). With respect to research:

> [a] favorable recommendation for the position to associate professor with tenure requires the candidate to have a significant record of high quality scholarly contributions to his or her field…. interpreted to mean that the candidate's research is of a quality commensurate with work published in the top journals in the candidate's discipline, and that leading scholars in the candidate's field along with the departmental colleagues attest to the importance of the overall contribution of the candidate's research. Reeves Dec., Ex. 7 (Zhang757-759).

Page 4    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The University Provost has final decision-making authority over tenure decisions. Reeves Dec., Ex. 6 (Coltrane 30b6 Dep. 24:21-25:3); Ex. 9 (Zhang_DS48, 87-99). In Plaintiff's case, Provost Scott Coltrane had the final say on tenure. Reeves Dec., Ex. 1 (Pl. Dep. 111:3-10; 112:7-10).

*2010-2013: Plaintiff told to improve research productivity*

Tenure track faculty are reviewed annually. Reeves Dec., Ex. 6 (Coltrane 30b6 Dep. 13:11-21). During Plaintiff's first-year review, Dr. Fang (then Department Head) encouraged Plaintiff "to concentrate his efforts on improving and refining the quality of his articles in order to increase the probability of their acceptance in top journals." Reeves Dec., Ex. 1 (Pl. Dep. 142:7-16); Ex. 11 (UO3546-47).

Tenure-track professors receive a major review during their third year. Reeves Dec., Ex. 9 (Zhang_DS48, 87-99). To receive another three-year contract, the College must reasonably expect that the candidate has potential to achieve tenure. Reeves Dec., Ex. 7 (Zhang757-759). Where progress is deficient, in lieu of terminating an assistant professor, the College may recommend reappointment for a shorter period with another intensive review. *Id.*

Plaintiff's third-year review occurred in 2013. Reeves Dec., Ex. 1 (Pl. Dep. 81:4-17; 261:11-15). Plaintiff understood that if his progress was insufficient, his employment might end. *Id.* (Pl. Dep. 81:18-82:2). An OBA Committee (Dr. Fang and Dr. Murthy) found Plaintiff's teaching and service adequate, but his "research performance thus far is lower than expected and desired." Reeves Dec., Ex. 12 (UO1938-1942). Although concerned, they recommended a one-year extension. *Id.* According to Dr. Murthy, "on the research side, my first impression was, it's not looking good. This needs

Page 5    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

to change a lot...I was rooting for his potential." Reeves Dec., Ex. 13 (Murthy Dep. 14:14-

15:4). According to Dr. Fang:

> I remember we try very hard because we want Dr. Yongli Zhang to
> be successful... Dr. Zhang's research record is weak. It's lower than college
> expectation, so we argue...he got two working paper and the review at
> premiere journals, he just need a little bit more time to get this pipeline,
> you know, back on track. Reeves Dec., Ex. 14 (Fang Dep. 37:13-38:5).

The LCB Committee similarly found his research deficient and

recommended a one-year extension. Reeves Dec., Ex. 15 (UO1944-1949). They

encouraged Plaintiff "to focus on trying to get kind of the highest possible quality

publications going forward, because there were concerns that the quality level might not

be sufficient to merit tenure if he didn't step up or ratchet up to that level." Reeves Dec.,

Ex. 16 (Pangburn Dep. 25:16-24).

Based on support from senior members of the OBA (including Dr. Fang),

the LCB Deans gave Plaintiff a one-year contract extension because "a reasonable

expectation exists for you to *within one year*, get back on a trajectory that *may* lead to

promotion and tenure." Reeves Dec., Ex. 17 (UO1952-1956)(emphasis in original).

*2014: Plaintiff was given another two years until tenure review*

At the end of his fourth year (2014), the LCB Deans consulted Dr. Fang

and others and renewed Plaintiff's contract for another two years. Reeves Dec., Ex. 18

(UO1127-1128). They advised:

> the revisions and modifications you are making to the two papers
> dealing with Adaptive Data Perturbation and ...High Dimensional Data Analysis
> ... appear to be sufficiently promising so that if accepted for publication in the
> very near future, **could, as part of your overall research portfolio, lead
> to a favorable tenure decision**. We sincerely hope that these two papers as
> well as the paper under review ... on "Cross validation for Modeling Procedure
> Selection" and at least one of you [sic] other working papers substantially moves
> forward in the review process in the coming year. *Id.* (UO 1127-1128) (emphasis
> added).

Page 6    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff was issued a 2014-2016 Notice of Appointment and Contract, wherein he again agreed to comply with all University administrative rules and policies. Reeves Dec., Ex. 19 (Zhang_DS210-211); Ex. 1 (Pl. Dep. 262:16-263:8).

*2015: Goulet Award for research*

Plaintiff made significant research progress during AY 2014-2015. Therefore, his Department Head, Dr. Koreisha, nominated Plaintiff for the Goulet Award "because at that time commendation of his work actually came to fruition. He had two papers either accepted or published. And so for that year, his research was – merited the – the Goulet award." Reeves Dec., Ex. 20 (Koreisha 30b6 Dep. 47:10-24).

*2015-2016: Plaintiff's tenure case had multiple levels of review*

<u>External Reviewers</u>

Plaintiff's tenure review began in Fall 2015 with the compilation of preparatory materials. Reeves Dec., Ex. 7 (Zhang757-759); Ex. 20 (Koreisha 30b6 Dep. 48:3-13). External review letters are one of several factors considered in an applicant's file; reviewers were chosen in consultation with Plaintiff. Reeves Dec., Ex 14 (Fang Dep. 101:3-19); Ex. 7 (Zhang757-759). Seven external reviewers submitted letters. Reeves Dec., Ex. 21 (UO3349-3368). The reviewers found Plaintiff's research to be of sufficiently high quality to recommend tenure at the University. *Id*. As discussed below, the reviewers recommendations seemed oddly superficial.

<u>OBA Committee Recommendation</u>

The OBA Tenure Committee ("OBA Committee") is comprised of all available tenured members of the department. Reeves Dec., Ex. 22 (Terborg 30b6 Dep. 13:14-24). In Plaintiff's case, the OBA Committee included Dr. Fang, Dr. Murthy, and

Page 7    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dr. Zhibin Yang. They reviewed materials and met multiple times. Reeves Dec., Ex. 13 (Murthy Dep. 21:20-22:1; 35:23-36:4). The OBA Committee determined that Plaintiff's research included two "premiere applied statistics journals" or "[t]wo A hits." Reeves Dec., Ex. 23 (Zhang339-347); Ex. 13 (Murthy Dep. 56:4-17; 113:12-13). Dr. Murthy felt that "the research productivity is falling short[.]" Reeves Dec., Ex. 13 (Murthy Dep. 22:4-23:10). He insisted on a cohort analysis[2] because "I think typically our best chance to support a case is based on cohort analysis." *Id.* (Murthy Dep. 33:7-14). "And I have actually done that consistently for all colleagues, is to fight for – when number is small, why we still should look for every single reason where we can justify within the standards of what we expect in the department." *Id.* (Murthy Dep. 29:2-17). In completing the analysis, the OBA Committee noted "the scarcity of data on statistics faculty in Business Schools." Reeves Dec., Ex. 23 (Zhang339-347).

It was a "tough case." Dr. Murthy testified: "I had tremendous expectations for his potential...when somebody is being denied tenure, it is a difficult decision. You want to be very sure that you are doing the right thing and the right assessment and being fair." Reeves Dec., Ex. 13 (Murthy Dep. 66:4-20). The case was also difficult for Dr. Fang. He even suggested that the committee provide a conditional offer of tenure. Fang Dec. ¶ 16. However, Dr. Koreisha clarified they had to make recommendations on the current record, "not on conditional what if – you know, what we wished for, what could happen in the future." Reeves Dec., Ex. 25 (Koreisha Dep.

---

[2] A cohort analysis is used "to evaluate the candidate against others of similar graduation dates. It is one way within a holistic approach to evaluate that person's research contributions compared to what others are doing. This allows you to see how you are – how you are comparing to your competition." Reeves Dec., Ex. 24 (Terborg Dep. 13:9-16).

64:11-19). The OBA Committee issued its recommendation on December 4, 2015, finding Plaintiff met standards for teaching and service, but not research. Reeves Dec., Ex. 23 (Zhang339-347). The committee was "impressed with the quality of Dr. Zhang's work," but "we have significant concerns with regards to Professor Zhang's research productivity[.]" *Id.*

Dr. Sergio Koreisha, OBA Department Head Recommendation

Dr. Koreisha issued his recommendation on December 12, 2015. Reeves Dec., Ex. 26 (UO2514-2520). Dr. Koreisha assessed Plaintiff's research to include two articles in premiere applied business statistics journals. *Id.* Plaintiff met teaching and service standards, but "his research portfolio to date falls short of our expectations." *Id.* Dr. Koreisha's assessment was independent of the Department's. Reeves Dec., Ex. 25 (Koreisha Dep. 45:7-23).

LCB Committee Recommendation

The Dean's Office selects the members of the LCB Committee which includes a tenured faculty member from each of the five LCB departments. Reeves Dec., Ex. 22 (Terborg 30b6 Dep. 14:11-24; 15:8-11). The LCB Committee was comprised of Dr. Robert Madrigal, Dr. Ro Gutierrez, Dr. Michael Pangburn, Dr. Ann Parmigiani, and Dr. Ryan Wilson. Reeves Dec., Ex. 27 (Zhang788-795). Dr. Pangburn represented the OBA Department. *Id.*

The LCB Committee was "concerned about the productivity dimension or facet of the case, and they were struck by the disparity between the internal and external letters" which was "somewhat unusual but not entirely." Reeves Dec., Ex. 16 (Pangburn Dep. 35:16-22; 84:25-85:4). The committee "endeavored not only to make our own independent assessment of his research record but also to understand the factors that

Page 9    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

might have led to the disparity between the internal and external letters." Reeves Dec., Ex. 27 (Zhang788-795). They also reviewed whether the cohort analysis conducted by the OBA Committee was framed properly. Reeves Dec., Ex. 16 (Pangburn Dep. 58:2-11). Dr. Gutierrez asked to expand the list of comparators (statisticians in business schools) to verify whether "the department's list was a little bit too stringent[.]."Reeves Dec., Ex. 20 (Koreisha 30b6 Dep. 37:5-15; 40:18-41:1). In performing its independent analysis, the LCB also found that availability of comparators was small.  Reeves Dec., Ex. 16 (Pangburn Dep. 98:20-99:15). They concluded that Plaintiff met the standards for teaching and service but did not meet the research standard. Reeves Dec., Ex. 27 (Zhang788-795).

Dr. James Terborg, LCB Dean Recommendation

Dean Terborg also concluded that Plaintiff met teaching and service standards for tenure, but not research. Reeves Dec., Ex. 28 (Zhang776-778). He noted "unique aspects to Professor Zhang's case that required my consideration from multiple perspectives" including the discrepancy between the internal and external reviewers and Plaintiff's receipt of the Goulet Award. *Id.* Dean Terborg found the external letters commented on the high quality of work but were "for the most part silent about his productivity" and provided little support for their conclusions. *Id.* Additionally, the Goulet Award looked at research performance from 2014-2015 only; outside of 2014-2015, Plaintiff had no top quality journal publications. *Id.*

The Dean meets with the candidate before the case goes to the next level to describe the review to date. Reeves Dec., Ex. 9 (Zhang_DS48, 87-99). This provides an opportunity to add material if the candidate disagrees and the Dean will hold the file to

allow additional submissions.[3] Reeves Dec., Ex. 6 (Coltrane 30b6 Dep. 68:2-16; 90:4-16). Dean Terborg met with Plaintiff and told him that the College could not support his tenure. Reeves Dec., Ex. 24 (Terborg Dep. 30:24-31:7). Plaintiff was given the opportunity to withdraw his tenure application; he chose to continue. *Id.* (Terborg Dep. 30:24-31:7). On February 5, 2016, the Dean issued his recommendation to deny tenure. Reeves Dec., Ex. 28 (Zhang776-778).

February 2016 Response Letter to Dean

Plaintiff submitted a response to the Dean's letter in February 2016 ("February 2016 Response Letter"), which was written with the help of the faculty union. Reeves Dec., Ex. 29 (Zhang_DS 185-187); Ex. 1 (Pl. Dep. 177:1-8). Plaintiff argued that the positive external review letters were nullified by the cohort analysis, his receipt of the Goulet Award attested to his strong performance, and that in 2011 he had been informed orally that "two A-level publication will" lead to a favorable tenure decision. Reeves Dec., Ex. 29 (Zhang_DS185-187). He also took issue with his two A-level journals being improperly characterized as "applied statistics journals." *Id.*

University Faculty Personnel Committee Recommendation

On February 29, 2016, the University Faculty Personnel Committee ("University FPC") voted on Plaintiff's case. Reeves Dec., Ex. 30 (Zhang20-22). They considered Plaintiff's February 2016 Response Letter and noted it was an "unusual case" where the external evaluators were supportive and the internal evaluators were not. *Id.* "Based on the positive views expressed in the outside letters regarding the quality of the

---

[3] Plaintiff could add materials throughout the process. Reeves Dec., Ex. 6 (Coltrane 30b6 Dep. 90:20-22); Ex. 24 (Terborg Dep. 31:11-20).

candidate's scholarship and the research award granted by the College, the majority of committee disagrees with the internal evaluators and recommends the granting of promotion and tenure."[4] *Id.*

Provost Scott Coltrane, Tenure Decision

Dr. Coltrane served as the Senior Vice President and Provost throughout Plaintiff's tenure case. Reeves Dec, Ex. 6 (Coltrane 30b6 Dep. 8:10-9:3). Dr. Coltrane looked:

> at the whole of the evidence. And it's not unusual for the different levels of the review to come to different conclusions. And so to the extent there's more ambiguity in a file, it requires more time. But that doesn't always go in one direction. You see some cases where the local reviews are negative, and some where they're positive, and where they're the opposite at a different level. It varies quite a bit, I guess, is what I'm saying. *Id.* (Coltrane 30b6 Dep. 57:7-25).

At the conclusion of the review, the Provost meets with the candidate as "a courtesy to discuss with the candidate face-to-face about the grounds and the content of the recommendation." *Id.* (Coltrane 30b6 95:2-8). Provost Coltrane met with Plaintiff on May 3, 2016 and informed him that his overall record of research did not support tenure. Reeves Dec., Ex. 31 (Coltrane Dep. 6:3-7:7). Dr. Coltrane told Plaintiff that his two "A" publications "were not a sufficient quantity. And the citation, and the impact on the field, the influence on the profession, as far as I could tell, was weaker than other cases in the past, did not meet the bar." *Id.* (Coltrane Dep. 8:1-18).

Provost Coltrane issued his decision on May 4, 2016 denying tenure. Reeves Dec., Ex. 32 (Zhang444).

---

[4] The vote was as follows: Strong Yes: 1; Yes: 3; Weak Yes: 4; No: 1; Conflict: 0; Abstain 2; Excused: 1; Absent: 0. Reeves Dec., Ex. 30 (Zhang20-22).

*Plaintiff's grievance appealing the Provost's decision*

Article 21 of the CBA provides "the only appeal process" on the Provost's tenure decision. Reeves Dec., Ex. 33 (Zhang_DS48; 99-103). Appeal may be based on: (1) whether the Provost was presented with errors of fact that materially affected the decision; (2) whether the Provost disregarded or overlooked material evidence; (3) whether material information was unavailable through no fault of the candidate; and (4) whether the decision was arbitrary or capricious. *Id.* The Provost prepares a written response and forwards the appeal and response to the Chair of the Promotion and Tenure Review Appeal Committee ("PTRAC"). The PTRAC evaluates whether an appeal is justified. "The findings of the committee are not binding, however, they are a recommendation to the provost." Reeves Dec., Ex. 6 (Coltrane 30b6 Dep. 44:5-11).

On July 15, 2016, Plaintiff submitted a 7-page appeal letter raising three issues: "Misleading and erroneous assessment of my research quality and productivity"; "Arbitrary and biased cohort analysis tailored for me"; and "unfairness." Reeves Dec., Ex. 34 (UO6-12). He noted "two major issues" in support: his two journals were "downgraded" by the OBA committee to an "A-"; and the unanimous support from the external reviewers was replaced by the cohort analysis. *Id.* "The two issues do not only violate academic integrity and the LCB tenure code but also result in substantial discrimination and unfairness." *Id.*

On August 12, 2016, Dr. Coltrane responded that all of the internal evaluators

> clearly accept[ed] the premiere status of the journals in question: department committee ("two are in the premiere applied statistics journals"), department head's report ("two articles in premiere applied business statistics journals"), college personnel committee ("two publications in top-tier journals"), and Dean ("two publications in A level applied statistics journals"). Thus, we

Page 13  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

cannot concur with Professor Zhang's claim that evaluation of the quality of the journals formed the primary basis for the internal assessments that his scholarship did not meet expectations. Reeves Dec., Ex. 35 (Zhang779-782).

He also addressed the cohort analysis noting that external evaluators were asked to compare Plaintiff with other scholars but failed to do so. *Id.* The Provost expects departmental colleagues "not to simply accept the recommendations of the external reviewers, but rather engage in their own thoughtful analysis of and deliberation about the facts of the case ... we cannot fault Professor Zhang's departmental or LCB colleagues for carrying out a cohort analysis, nor can we fault their selection process for this cohort, which is clearly established and justified in the dossier." *Id.* (Zhang779-782). Dr. Coltrane responded to Plaintiff's reference to "fundamental discrimination" or "substantial discrimination":

> On the basis of a careful scrutiny of the facts of the case, we see no evidence for anything but a rigorous examination of Professor Zhang's professional record. The reports in the dossier evince considerable thoughtfulness and a valiant effort to 'find the way to yes' on the recommendation for tenure, an effort that in the end led each internal reviewer and review committee to the conclusion that they could not support a positive recommendation. *Id.* (Zhang 779-782).

The PTRAC considered Plaintiff's appeal on November 18, 2016. Reeves Dec., Ex. 36 (UO1-3). The PTRAC focused on interpretation of the LCB Policy defining a significant record of high quality scholarship to mean that the candidate's research is of a quality commensurate with work published in the top journals in the candidate's discipline. *Id.* The PTRAC found that the Provost did not give due consideration to the phrase "commensurate with":

> Based on the answers we received from the witnesses at the hearing the PTRAC finds that at all levels of the tenure review, and in the Provost's response, the clear language on research evaluation in the Policy, which is the set of tenure and promotion guidelines for all departments in the LCB, was either ignored or not noticed. Since the external reviewers, who were vetted by the

Page 14  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department itself, all recommended Professor Zhang for promotion with indefinite tenure on the basis of the quality of his publications, we find the procedure in his tenure case was not based either on the Policy or on the external reviewers' recommendations. For this reason, we find that Professor Zhang's appeal is justified. *Id.* (UO1-3).

*Provost Coltrane upholds his decision*

After reviewing Plaintiff's case again, on December 12, 2016, the Provost affirmed his decision to deny tenure. Reeves Dec., Ex. 37 (Zhang786-787). Responding to PTRAC's conclusion that he did not consider "commensurate with," he clarified that *quality* was not the issue at any level. *Id.* "The external and internal review committees reported favorably on the quality of your publications, based both on their appearance in highly-rated journals and on individual and collective evaluations of their quality regarding the journal in which they were published." *Id.* However, the issue unaddressed by external reviewers was the broader question of overall contribution. *Id.*

*Appeal to the President*

The CBA provides that the faculty member may appeal to the President. Reeves Dec., Ex. 33 (Zhang_DS48; 99-103). "The President's decision is final and binding and is not subject to grievance, arbitration or further appeal." *Id.* Plaintiff submitted an appeal to UO President on December 21, 2016. Reeves Dec., Ex. 38 (UO1442-1444). On January 11, 2017, the President affirmed the Provost's decision and found "it is my conclusion that your case was handled in a manner completely consistent with the University and [LCB] policies and procedures." Reeves Dec., Ex. 39 (UO1445).

**2.    Allegations Against Dr. Fang**

The cornerstone of Plaintiff's case is his claim that Dr. Fang made "unethical requests" of him because of their shared Chinese heritage, and then retaliated

against Plaintiff because he refused those requests. Plaintiff's alleged unethical requests span from 2010 to 2013.

*2010: Loan to Purchase Home*

Plaintiff claims Dr. Fang "forced Zhang to loan him about $40,000, which Fang said he needed to complete the purchase of a new home." Amended Complaint ¶ 40. But Plaintiff testified that the loan was actually only for $8,000 and that it was a "request" to which he acquiesced without objection—not a "demand." Reeves Dec., Ex. 1 (Pl. Dep. 192:16-194:194:7; 198:24-199:4). Plaintiff's only concern was how soon he would be paid back. *Id.* (Pl. Dep. 195:11-18). Plaintiff described the loan as "inappropriate" (as opposed to "unethical"). *Id.* (Pl. Dep. 206:9-13). Plaintiff never told Dr. Fang he felt the request was inappropriate, nor did Plaintiff make any reports to anyone at the University prior to his tenure denial about the loan. *Id.* (Pl. Dep. 199:5-16).

*2010: Independent Study with Dr. Fang's Son*

Plaintiff alleges that in Fall 2010, Dr. Fang asked him to help his son on a research project. *Id.* (Pl. Dep. 150:2-25). Plaintiff did not find the initial request to be objectionable. *Id.* (Pl. Dep. 153:11-18). However, "[f]ollowing this conversation, after I gave him some suggestions, [Dr. Fang] asked me to do this project. I cannot accept this... But finally, I did it." *Id.* (Pl. Dep. 151:1-12). According to Plaintiff, the project with Dr. Fang's son changed their relationship and crossed a boundary. Plaintiff could not identify an ethical violation: "I'm not very familiar with the code, but from my understanding, I think profession is profession. Personal is personal." *Id.* (Pl. Dep. 153:2-10; 164:2-8). Plaintiff never objected to the request. *Id.* (Pl. Dep. 163:24-164:1).

Page 16  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Nor did he report the son's independent study to anyone at the University prior to his tenure denial. *Id.* (Pl. Dep. 165:3-13).

*2013: Independent Study with Dr. Fang's Daughter*

Plaintiff alleges that in Fall 2013,[5] Dr. Fang "asked for my permission" to register Dr. Fang's daughter in an independent study, and "I said, 'Okay, you can register my independent study.'" *Id.* (Pl. Dep. 165:25-166:6). According to Plaintiff, Dr. Fang's daughter did no work, he never spoke to her, and never saw a written paper. *Id.* (Pl. Dep. 166:7-22; 169:6-12). Nonetheless, he gave her an "A."[6] *Id.* (Pl. Dep. 166:23-167:9; 170:15-24). Plaintiff "never" said "no" to Dr. Fang's request. *Id.* (Pl. Dep. 169:13-24). Nor did he make any reports to anyone at the University prior to his tenure denial about the daughter's independent study. *Id.* (Pl. Dep. 173:22-174:10).

*2013: Suggested Co-Authorship on Papers*

In June 2013, Dr. Fang suggested that he and Plaintiff collaborate on research; Plaintiff felt "very uncomfortable" with the conversation because Plaintiff felt that Dr. Fang was asking to be added to a single authored paper without doing any work. *Id.* (Pl. Dep. 213:13-21; 214:13-22). That is not what Dr. Fang said, but Plaintiff felt "very uncomfortable about that conversation. His words were very straightforward, 'We should help each other. And I put your name. So if I do something, I put your name. You

---

[5] Dr. Fang's daughter did an independent study in Fall 2013, however Plaintiff's Complaint lists the date as 2010. Plaintiff testified that this is a "typo." Reeves Dec., Ex. 1 (Pl. Dep. 192:7-21).

[6] Although not necessary to resolve for this motion, Dr. Fang disputes that his daughter did not do any work to earn the grade. Fang Dec. ¶ 15 . However, Plaintiff's admission that he gave an "A" that was not earned would be a serious violation of University policy and a possible separate basis to deny tenure.

do something, put my name. Okay. Everyone will have two papers.'" *Id.* (Pl. Dep: 228:7-16). Dr. Fang's actual words were: "We should help each other on publication." *Id.* (Pl. Dep. 228:17-20). Plaintiff felt like Dr. Fang's request was unethical and speculates that Dr. Fang "must be a little disappointed when I said no." *Id.* (Pl. Dep. 230:4-14; 209:5-210:5; 229:24-230:3.) However, Plaintiff never told anyone at the University about the conversation. *Id.* (Pl. Dep. 230:4-14).

*Plaintiff's Relationship with Dr. Fang*

Dr. Fang and his family supported Plaintiff as a friend and colleague. In 2011 and 2013, Dr. Fang wrote to the U.S. Citizenship and Immigration Services on Plaintiff's behalf in support of permanent residency and his HB-1 visa. Fang Dec. ¶ 13. Dr. Fang's wife researched and provided recommendations on a summer camp for Plaintiff's nephew on his request. Reeves Dec., Ex. 1 (Pl. Dep. 203:10-20; 204:16-21). Further, Dr. Fang collaborated with Plaintiff on research as evidenced by Plaintiff listing five separate projects with Dr. Fang as part of his research portfolio for tenure. Reeves Dec., Ex. 40 (UO985-987).

### 3.    **Procedural Background**

After being denied tenure, Plaintiff filed a notice under the Oregon Tort Claims Act on May 26, 2017. Reeves Dec., Ex. 41. Plaintiff filed a complaint with the Oregon Bureau of Labor and Industries ("BOLI") and EEOC on October 2 and 9, 2017. Reeves Dec., Ex. 42; Ex. 43. On January 2, 2018, BOLI issued a 90-day notice. Reeves Dec., Ex. 44. EEOC issued its 90-day notice on February 6, 2018. Reeves Dec., Ex. 45. Plaintiff filed his lawsuit February 5, 2018; he filed his Amended Complaint May 3, 2018. (ECF #s 1 and 11).

**C.      SUMMARY JUDGMENT STANDARD**

Summary judgment is permitted when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Proc. 56(c). If a party fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial, summary judgment is appropriate. A principal purpose of summary judgment "is to isolate and dispose of factually unsupportable claims." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-4, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**D.      ARGUMENT**

     **1.      Jurisdictional Issues**

          **a.      Plaintiff's claims are untimely.**

To bring a claim under ORS Chapter 659A, Plaintiff has one year to file a civil action or complaint with BOLI. ORS 659A.875(1), (2). Because Plaintiff filed with BOLI on **October 2, 2017,** his Oregon employment claims are limited to actions that occurred *on or after October 2, 2016*. To bring a Title VII claim, Plaintiff must file a timely charge of discrimination with EEOC within 300 days. 42 U.S.C. § 2000e-5(e)(1).

Page 19  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff's EEOC charge was filed on **October 9, 2017,** limiting his Title VII claim to actions that occurred *on or after December 13, 2016.*

Plaintiff's claims are untimely. In a similar case, the U.S. Supreme Court considered whether a college professor timely filed a complaint alleging that he was denied tenure because of national origin. *Delaware State Coll. v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). The professor was notified by the tenure committee that he did not receive tenure in February 1974, the Board of Trustees voted to deny tenure in March 1974, and the Trustees informed him of his terminable contract in June 1974. The professor filed a grievance appealing the decision—the grievance was denied September 12, 1974. Plaintiff filed with the EEOC on April 4, 1976.

The EEOC (as *amicus*) argued that the statute of limitations commenced the date his grievance was *denied*. The Court *rejected* that argument because "entertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made... the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." 449 U.S. at 261 (emphasis in original)(citations omitted). The Court continued, "[t]he existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made." 449 U.S. at 261.

In this case, the Provost denied Plaintiff's tenure on May 4, 2016; this triggered his time to file a discrimination claim. He did not file with EEOC within 300 days or with BOLI within one year. His grievance appealing the Provost's decision did

Page 20 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

not toll the statute of limitations. Pursuing a CBA violation and filing a discrimination complaint with BOLI/EEOC are distinct remedies.[7] It logically follows that as such, one does not toll the other. Plaintiff's claims under Title VII and ORS 659A 030 are untimely.

> b.    **Plaintiff's state claims are barred by the OTCA.**

Plaintiff claims against the University include Oregon tort claims which are subject to the Oregon Tort Claims Act ("OTCA"). The OTCA is a limited waiver of immunity which subjects public bodies in Oregon to limited liability. ORS 30.265(1). The OTCA requires that a "notice of claim" be given the public body "within 180 days after the alleged loss or injury." ORS 30.275(2)(b). "The requirement that notice be given timely is a substantive condition precedent to recovery under the [OTCA] that, if not satisfied, deprives a plaintiff of the right to make a claim." *Orr v. City of Eugene*, 151 Or. App. 541, 543, 950 P.2d 397, 398 (1997), *citing Tyree v. Tyree,* 116 Or. App. 317, 320, 840 P.2d 1378 (1992), *rev. den.* 315 Or. 644, 849 P.2d 525 (1993).

Plaintiff's notice was dated **May 26, 2017**. Reeves Dec., Ex. 41. Any actions arising under state law prior to November 27, 2016 (180 days before the notice) are barred. Plaintiff's tenure was denied on May 4, 2016. Under *Ricks*, the filing of a grievance does not toll the statute of limitations. Nor should it toll the tort claims notice period which acts as a jurisdictional bar. Plaintiff's state claims are time-barred.

---

[7] In *Portland State University Chapter of the AAUP v. Portland State University*, 352 Or. 697 (2012), the faculty member filed a grievance challenging nonrenewal of contract after she filed a sexual harassment complaint. The CBA included a clause that allowed PSU to discontinue the grievance if the faculty member pursued complaints with an outside agency. The court discussed rights to pursue redress for contractual violations under the CBA as distinct from rights to pursue BOLI/EEOC. The clause in the CBA that allowed PSU to discontinue the grievance if employee filed complaint with BOLI/EEOC was invalid under anti-retaliation statutes.

Page 21  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

2.    **Count I: Race and National Origin Discrimination - Title VII and ORS 659A.030 Against University**

a.    **Standards under Title VII and ORS 659A.030.**

Plaintiff claims that he was subject to disparate treatment on the basis of race and national origin. It is unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race…or nation origin[.]" 42 U.S.C. § 2000e–2(a)(1) (2005). Plaintiff must show that he "is singled out and treated less favorably than others similarly situated on account of race." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006), citing *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1121 (9th Cir.2004) (internal quotation marks omitted) (quoting *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir.1988)).[8]

To establish a *prima facie* case, Plaintiff must offer proof: (1) that he belongs to a protected class; (2) that he performed satisfactorily; (3) that he suffered an adverse employment action; and (4) that his employer treated him differently than a similarly situated employee not in the same protected class. See *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by

---

[8] The analysis governing Title VII and ORS 659A.030 is identical. *Reid v. Evergreen Aviation Ground Logistics Enterprises Inc.*, No. 07-1641-AC, 2009 WL 136019, at *7 (D. Or. Jan. 20, 2009) ("standard for establishing a prima facie case of discrimination under OR.REV.STAT. § 659.030 is identical to that used to establish a prima facie case of discrimination under Title VII"); *Pool v. VanRheen*, 297 F.3d 899, 909-10 (9th Cir. 2002) (analyzing retaliation claim under O.R.S. 659A.030 under Title VII standards). Consequently, Defendant has set forth its analysis under Title VII law in the discrimination and retaliation sections of this Brief.

Page 22 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

a preponderance of the evidence that the defendant undertook the challenged

employment action because of the plaintiff's race." *Cornwell*, 439 F.3d at 1028.

*McDonnell Douglas* established the "order and allocation of proof" in Title

VII cases: (1) Plaintiff presents evidence sufficient to constitute a prima facie case of

discrimination; (2) the employer "articulates" a legitimate non-discriminatory reason

for the adverse employment decision; and (3) then Plaintiff must show that the

"assigned reason" was "a pretext or discriminatory in its application." 411 U.S. at 807.

### b.    Plaintiff has no evidence of discrimination based on race or national origin.

Plaintiff fails to meet his prima facie case because he has no evidence that

he was denied tenure because of his race or national origin.

*No evidence of race or national origin discrimination by Dr. Fang.*

Plaintiff's claims of race and national origin discrimination rely on

allegations that Dr. Fang treated him differently because of their shared Chinese

national origin. *See* Amended Complaint ¶s 17, 37, 41-45, 47, and 50. But Plaintiff has no

evidence of this. They never discussed Chinese culture requiring respect for elders and

senior colleagues. Reeves Dec., Ex. 1 (Pl. Dep. 148:22-25). Dr. Fang never made any

statements to Plaintiff about how he expected younger Chinese people to behave; he

never made statements criticizing Plaintiff for behavior not comporting with a younger

Chinese person. *Id.* (Pl. Dep. 240:16-241:3). In fact, Plaintiff's "evidence" of

discrimination is his subjective *lack of evidence* of another explanation for not receiving

tenure:

> You have -- so if all things happens to me, all these things happen to
> me, you should think about the reason. Why did he do this? Because I'm young?
> Because I'm -- because I'm 42 years old? So what's the reason? He made so many
> requests because I'm from Minnesota? Because I'm from Hubei Province? What's

the reason? So the only reason I can figure out is Chinese origin. You know your mathematics, we call it exclusion.  If every possibility is included, then the remaining reason is Chinese origin. *Id.* (Pl. Dep. 239:14-240:15).

Plaintiff also attempts to support his discriminatory theory by asserting that Dr. Fang has not made any similar requests of people who are not Chinese. *Id.* (Pl. Dep. 241:4-9). "For such question in statistics, we call it A/B test. So you can ask Yue Fang if he made similar request from other faculty members who is not Chinese." *Id.* (Pl. Dep. 235:19-236:9). But again, Plaintiff has no evidence that Dr. Fang treats non-Chinese people dissimilarly. When asked whether Dr. Fang has ever made unethical requests of non-Chinese faculty members, Plaintiff responded, "I have no idea." *Id.* (Pl. Dep. 239:10-13; 236:16-237:4; 237:24-238:12). Nor does he have evidence of whether Dr. Fang treated other Chinese people similarly. There are other Chinese faculty members in the LCB including in the OBA Department. Fang Dec. ¶ 19. Indeed, the fact that there *are* other Chinese faculty members who received tenure during Dr. Fang's employment negates Plaintiff's argument and belief.[9]

*No evidence of influence by Dr. Fang.*

Dr. Fang was one of over twenty people who participated in making recommendations in Plaintiff's tenure case, none of whom had authority to grant tenure. If a subordinate puts in motion a proceeding by an independent decision maker that leads to an adverse employment action, "the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse decision was not actually independent because the bias subordinate influenced or was involved in the decision making process." *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007).

---

[9] Plaintiff ignores the fact that Dr. Fang simply considered him a friend.

Plaintiff makes no claim that the decision maker—Provost Coltrane—had any discriminatory or retaliatory motive. Rather, Plaintiff relies *entirely* on a discriminatory and retaliatory motive of Dr. Fang. As discussed, there is no evidence of such motive by Dr. Fang. But even assuming Plaintiff established some improper motive by Dr. Fang, Plaintiff fails to show Provost Coltrane was influenced by that.

Plaintiff claims that he has "very strong evidence" that Dr. Fang attempted to influence members of the college committee. He has no evidence. Reeves Dec., Ex. 1 (Pl. Dep. 267:9-25). Plaintiff had no conversations with the other members of the OBA Committee—Dr. Murthy or Dr. Yang—about whether Dr. Fang influenced them. *Id.* (Pl. Dep. 248:5-23). In fact, Dr. Murthy testified that "[Dr. Fang] never had even once any negative comment while we were assessing. He let us speak our judgment on whether the – the record was sufficient[.]"Reeves Dec., Ex. 13 (Murthy Dep. 72:5-19). Plaintiff has no evidence that Dr. Fang attempted to influence Dr. Koreisha or the LCB Committee. Reeves Dec., Ex. 1 (Pl. Dep. 263:24-264:8; 266:11-22; 269:12-15). He has no evidence that Dr. Fang had any contact with the Provost or the President. *Id.* (Pl. Dep. 272:21-23; 274:18-275:6; 304:13-17). He has no evidence of any attempt by Dr. Fang to influence anyone in the tenure process or be involved in the Provost's decision-making process. [10] To the contrary, the evidence demonstrates that Dr. Fang *wanted* Plaintiff to be awarded tenure. Fang Dec. ¶ 18.

---

[10] Plaintiff advances an argument that Dr. Fang tried to use his status as a statistician to influence the tenure review. Amended Complaint ¶ 83. This is not evidence of race or national origin discrimination. Further, Dr. Fang's statistical expertise had no bearing on the LCB's conclusion that the issue was with *quantity*, not *quality*.

Page 25  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff's discriminatory or retaliatory motive by Dr. Fang is purely speculative which is not sufficient. To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1060–61 (9th Cir. 2011) (affirming summary judgment where plaintiff defended retaliation claim by speculating that other officials who knew of her protected activity may have poisoned decision maker).

Plaintiff may argue that Dr. Fang's discriminatory intent should be imputed to the Provost (cat's paw liability). The Supreme Court has considered when employer may be liable for discriminatory animus of an employee who influenced, but did not make, the ultimate decision. *Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011). In *Staub*, the plaintiff's immediate supervisor and supervisor above were hostile towards plaintiff's military obligations. The Court discussed whether an employer's decision maker can be isolated from an employee's supervisors, holding: "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable[.]" *Staub*, 562 U.S. at 422 (emphasis in original). The Court was very specific about *supervisors*: "Since a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a motivating fact in the employer's action[.]" 562 U.S. at 421.

During the entirety of the tenure process, Dr. Fang was a colleague with no supervisory position or role. Any discriminatory or retaliatory intent cannot be imputed to the Provost.

### c.  The University had legitimate non-discriminatory reasons for denying tenure.

"If the plaintiff establishes a prima facie case, the burden of production—but not persuasion—then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054,1062 (9th Cir. 2002). Once the employer fulfills this burden of production, the "presumption of unlawful discrimination 'simply drops out of the picture.' " *Wallis v. J.R. Simplot Col.,* 26 F.3d 885, 889 (9th Cir. 1994) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). The evidence outlined above demonstrates Plaintiff was denied tenure based on his lack of research productivity, *i.e.* the quantity of his scholarship. Deficient scholarship is an articulated and legitimate, nondiscriminatory reason to deny tenure. *See Laborde v. Regents of Univ. of California,* 686 F.2d 715, 718 (9th Cir. 1982) (holding that deficient scholarship is a legitimate, nondiscriminatory reason to deny promotion).

### d.  Plaintiff cannot establish pretext.

If the employer sufficiently articulates a nondiscriminatory reason, the plaintiff "must show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Villiarimo,* 281 F.3d at 1062 (*quoting Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1124 (9th Cir.2000)). A plaintiff may meet this burden with direct or circumstantial evidence. *See Coghlan v. American Seafoods Co. LLC,* 413 F.3d 1090, 1094–95 (9th Cir.2005). Direct evidence typically consists of sexist, racist or similarly

Page 27  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

discriminatory statements or actions. *See Coghlan*, 413 F.3d at 1095. Plaintiff has no direct evidence. A plaintiff may prove pretext with indirect or circumstantial evidence that shows the employer's explanation is unworthy of credence. *See Vasquez v. County of L.A.,* 349 F.3d 634, 641 (9th Cir.2004). Circumstantial evidence must be "specific and substantial" to defeat the employer's motion for summary judgment. *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir. 1998).

Plaintiff offers two theories of "evidence" to show his tenure denial was pretextual. Both relate to evaluation of his research: how Plaintiff's journals were referred to and ranked and the cohort analysis. But Plaintiff's assumptions and beliefs are undermined by the evidence. First, the consistent concerns with Plaintiff's research were with the *quantity*, not the *quality* of research. Plaintiff only published two papers in premier scholarly journals during a six-year period. Second, Plaintiff believes that the cohort analysis was created by Dr. Fang to nullify the positive external review letters. There is no evidence that Dr. Fang was behind cohort analysis; in fact Dr. Murthy "insisted" on a cohort analysis and Dr. Gutierrez initiated additional analyses at the next review level. Further, although Plaintiff alleges the cohort analysis was only done in his case, it is commonly done. Reeves Dec., Ex. 16 (Pangburn Dep. 39:19-40:2; 126:6-8).

Because the factual allegations Plaintiff relies on as support for circumstantial evidence is incorrect, if not the opposite of what he alleges, Plaintiff fails to show pretext or a prima facie case of discrimination. Accordingly, his discrimination claims should be dismissed. *See Goberman v. Washington Cty.*, 2001 WL 34045881, at *10 (D. Or. Apr. 26, 2001) (plaintiff's "subjective belief that he has been discriminated against is insufficient to create a genuine issue of material fact."); *Chaudhary v. Telecare Corp.*, 2000 WL 1721075, at *6 (N.D. Cal. Nov. 12, 2000) (plaintiff's conclusory

Page 28 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

allegations to support pretext are insufficient to create a triable issue of fact on her intentional discrimination claim).

### 3.   Count II: Retaliation - Title VII and ORS 659A.030 Against University

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees * * * because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 USC § 2000e-3(a).[11] In order to establish a prima facie case of retaliation, Plaintiff must demonstrate that (1) he engaged in a protected activity; (2) the employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. See *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004); *citing Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). Plaintiff cannot meet the first and third elements.

#### a.   Plaintiff did not make any reports before his tenure was denied.

Plaintiff cannot establish that he engaged in protected activity. Plaintiff claims that Dr. Fang discriminated against him as far back as 2010. Reeves Dec., Ex. 1 (Pl. Dep. 241:15-19). Plaintiff knew the CBA included an article on non-discrimination and a grievance procedure. *Id.* (Pl. Dep. 94:6-13; 95:16-19; 88:9-89:17). Plaintiff filed no grievances alleging discrimination, nor did Plaintiff make any reports of race or national origin discrimination to anyone prior to his tenure being denied. *Id.* (Pl. Dep. 242:7-13).

---

**11** ORS 659A.030(1)(f) provides "[i]t is an unlawful employment practice * * * [f]or any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so."

Page 29 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The first report of "discrimination" was during his grievance appeal letter to the Provost in July 2016, *after* the Provost had already denied tenure. *Id.* (Pl. Dep. 241:22-242:13); Ex. 34 (UO6-12). However, nowhere in the 7-page letter, does Plaintiff mention race, national origin, or Dr. Fang. Reeves Dec., Ex. 34 (UO6-12). It speaks entirely about the merits of his case and research record. *Id.* The first report of discrimination based on race or national origin was in Plaintiff's tort claim notice dated May 26, 2017, a year after the Provost denied tenure—even there, Plaintiff does not mention Dr. Fang. Reeves Dec., Ex. 41.

Plaintiff's retaliation claims lacks a fundamental element –a protected activity which led to retaliation.

### b.    Plaintiff cannot establish causation.

Plaintiff must show that engaging in protected activity was one of the reasons for his tenure denial. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064–65 (9th Cir. 2002). Plaintiff cannot do so. First, as noted, he did not engage in protected activity. Second, if Plaintiff is trying to use his refusal of Dr. Fang's requests as the basis for retaliation by Dr. Fang, this argument also fails. As discussed, Plaintiff has no evidence of Dr. Fang's discriminatory or retaliatory motive.

Further, Plaintiff cannot rely on temporal proximity (he rejected Dr. Fang's requests and subsequently Dr. Fang recommended against tenure) because the alleged acts occurred *years* before Plaintiff's tenure process. In some cases, causation can be inferred from timing where adverse employment actions follow on the heels of protected activity. *Villiarimo*, 281 F.3d at 1065. However, the temporal proximity "must be 'very close[.]" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001)(20 months between the protected activity and the

Page 30 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

adverse employment action suggests "no causality at all"); V*illiarimo*, 281 F.3d 1054,

1065 (18-month lapse "is simply too long[.]"). Plaintiff alleges that Professor Fang

retaliated against him for refusing demands in 2010 to 2013. His tenure review was in

Fall 2015. Two years between the alleged activity and the tenure recommendation is too

long to establish causation.

### 4. Count III: Race and National Origin Discrimination Claims - 42 U.S.C. 1981 and 1983 Against University and Dr. Fang

#### a. The University is not a "person."

Plaintiff's claim against the University for a violation of 42 U.S.C. § 1983

fails as a matter of law. Plaintiff must establish "(1) deprivation of a right secured by the

Constitution and laws of the United States, and (2) that the deprivation was committed

by a *person* acting under color of state law." *Chudacoff v. Univ. Med. Ctr. of S. Nevada*,

649 F.3d 1143, 1149 (9th Cir. 2011) (citation omitted) (emphasis added). Whether a state

entity is considered a "person" under § 1983 depends on whether the entity would be an

"arm of the state" under the Eleventh Amendment. *See Will v. Michigan Dep't of State*

*Police*, 491 U.S. 58, 70 (1989) ("States or governmental entities that are considered

'arms of the state' for Eleventh Amendment purposes" are outside the scope of § 1983).

The Ninth Circuit has held that the University of Oregon is an "arm of the state" for

Eleventh Amendment purposes. *Rounds v. Oregon State Bd. of Higher Educ.*, 166 F.3d

1032, 1035 (9th Cir. 1999). As such, it is immune from suit under § 1983. *See, e.g.*,

*Hariri v. Portland State Univ.*, No. 3:15-CV-1076-PK, 2017 WL 826961, at *11 (D. Or.

Mar. 2, 2017), *aff'd*, No. 17-35280, 2018 WL 5098830 (9th Cir. Oct. 18, 2018) (Portland

State University is "arm of the state" and immune from § 1983 suit); *Houston v. Univ. of*

*Oregon*, No. CIV. 02-6288-TC, 2004 WL 1612950, at *4 (D. Or. Feb. 25, 2004)

Page 31  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(University of Oregon is an immune "arm of the State"). Likewise, the University is immune from suit under Plaintiff's § 1981 as well. *See Pittman v. Oregon, Employment Dep't*, 509 F.3d 1065, 1071 (9th Cir. 2007).

Plaintiff's § 1981 and § 1983 claims against the University must be dismissed.[12]

### b.    Dr. Fang is entitled to qualified immunity.

An individual defendant is entitled to qualified immunity when the alleged actions do not violate "clearly established" rights. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The query is not *whether* the alleged actions did or did not violate a right (indeed, an individual defendant is entitled to qualified immunity *in spite of* the fact that he may have violated a right), the query is whether the defendant should have known at the time of the alleged actions, that the actions were "clearly established" violations of Plaintiff's constitutional or statutory rights. Qualified immunity is defeated only if "in the light of pre-existing law the unlawfulness of his conduct was 'apparent.'" *Grossman v. City of Portland*, 33 F.3d

---

[12] It is unclear if Plaintiff brings the § 1981 and 1983 claims action against Dr. Fang in his official capacity. If so, these claims must also be dismissed against Dr. Fang because an official acting in official capacity is not a "person" under § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71; *Staples v. Dep't of Soc. & Health Servs.*, 2009 WL 412920, at *1 (W.D. Wash. Feb. 17, 2009) (Individuals in their official capacity cannot be sued under § 1981).

1200, 1208 (9th Cir. 1994) (quoting *Anderson*, 483 U.S. at 640). "When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044, 192 L. Ed. 2d 78 (2015) (internal punctuation and citations omitted).

i. Section 1981

Dr. Fang is entitled to qualified immunity on Plaintiff's § 1981 claim because Plaintiff relies on actions that do not constitute race discrimination under clearly established law. Although Plaintiff casts his claims as "race" and "national origin" discrimination, they are based entirely on shared Chinese culture – not on race. Section 1981 provides a federal remedy against *race*-based discrimination. *Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (noting that § 1981 applies only to race-based discrimination). Plaintiff alleges that a shared Chinese culture led to Dr. Fang's requests. When Plaintiff refused, he alleges that Dr. Fang retaliated. This is not sufficient to state a claim under § 1981. *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613, 107 S. Ct. 2022, 2028, 95 L. Ed. 2d 582 (1987) (to determine on remand whether plaintiff can prove he was subject to intentional discrimination under § 1981 based on the fact that he was born an Arab, rather than solely on the place or nation of origin).

ii. Section 1983

Dr. Fang is also entitled to qualified immunity on Plaintiff's § 1983 claim. Plaintiff must show that Dr. Fang discriminated against him "with respect to his compensation, terms, conditions, or privileges of employment" because of his national origin. 42 U.S.C. § 2000e-2; *See Peters v. Lieuallen*, 746 F.2d 1390, 1393 (9th Cir. 1984) (because plaintiff failed to prove intentional discrimination under Title VII, claims

Page 33  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

under § 1983 must also fail). Plaintiff essentially alleges that Dr. Fang discriminated against him by performing personal favors unrelated to the workplace. Amended Complaint ¶s 38-40. These requests do not constitute a change in the terms and conditions of Plaintiff's employment.[13] Title VII's antidiscrimination provision "explicitly limit[s] the scope of that provision to actions that affect employment or alter the conditions of the workplace." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62, 126 S. Ct. 2405, 2411–12, 165 L. Ed. 2d 345 (2006) (distinguishing substantive discrimination adverse actions from discriminatory retaliation that can occur *outside* the workplace). Discrimination in this context includes actions that affect an individual's "compensation, workplace conditions, responsibilities, or status" in the workplace. *Woods v. Washington*, 475 F. App'x 111, 112 (9th Cir. 2012).

None of the alleged requests by Dr. Fang impacted the terms and conditions of Plaintiff's employment. Nor could the alleged unlawfulness of these "demands" be apparent to Dr. Fang because Plaintiff admits that he never outwardly expressed unwillingness to comply and Dr. Fang also helped Plaintiff with non-work requests (immigration paperwork, summer camp recommendations). Reeves Dec., Ex. 1 (Pl. Dep. 169:13-24; 203:10-25; 204:16-21); Fang Dec. ¶ 13. Defendants are unaware of a case where acts performed outside of work in the context of a friendship formed the basis for a discrimination claim. Applying qualified immunity, it cannot be said that when Dr. Fang made the requests that he understood he was violating Plaintiff's clearly established rights. *See Reichle v. Howards*, 566 U.S. 658, 664 (2012) (To be clearly

---

[13] Notably, Plaintiff does not allege that Dr. Fang's requests created a hostile work environment.

Page 34 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

established, a right must be sufficiently clear "that every reasonable official would [have understood] that what he is doing violates that right."). Accordingly, Dr. Fang is entitled to qualified immunity on Plaintiff's § 1983 claim.

> **c.    Plaintiff has no evidence of discrimination or bias by Dr. Fang.**

As discussed above, Plaintiff lacks evidence of discrimination by Dr. Fang to support Plaintiff's Title VII and ORS 659A.030. Title VII and Section 1981 both prohibit discrimination on the basis of race. Claims brought under 1981 and 1983 require proof of *intentional* discrimination. S*ee Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Craig v. County of Los Angeles*, 626 F.2d 659 (9th Cir. 1980), *cert. denied*, 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981). Plaintiff cannot meet his burden under Title VII or his burden for intentional discrimination under 1981 or 1983.

> **5.    Count IV: Whistleblower Retaliation - ORS 659A.203 Against University**

ORS § 659A.203 forbids a public employer from "[p]rohibit[ing] any employee from disclosing, or tak[ing] or threaten[ing] to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of," among other things, "[a] violation of any federal or state law" or "[m]ismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision." ORS 659A.203. To establish a prima facie case, Plaintiff must show that he "(1) engaged in a protected activity, (2) suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision." *Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077,

Page 35  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1091 (D. Or. 2015), *citing Neighorn v. Quest Health Care,* 870 F.Supp.2d 1069, 1102 (D.Or.2012). Plaintiff fails the first and third elements.

      As noted, Plaintiff made no reports of any alleged discriminatory conduct or unethical requests by Dr. Fang until after his tenure was denied. Plaintiff made no effort to find applicable policies to determine if Dr. Fang's requests were unethical. Reeves Dec., Ex. 1 (Pl. Dep. 86:15-22). He had never seen University's Code of Ethics or Fraud, Waste, or Abuse Reporting Policies before this lawsuit. *Id.* (Pl. Dep. 87:15-18; 98:23-99:4). Had he reviewed them (as required by contract), he would have found that employees are required to "act with responsibility by reporting unethical and illegal conduct to appropriate authorities." Reeves Dec., Ex. 46.

      Plaintiff never made any reports to the University hotline or to anyone prior to the time the Provost denied his tenure. Plaintiff explicitly admitted that intentionally did not make any such report. His initial draft of his response letter to the Dean included "general allegations" of being asked to engage in unethical behavior; upon advice of his faculty union, he took them out. *Id.* (Pl. Dep. 100:5-22; 177:1-12). Thus, the February 2016 letter contained no such allegations, and Plaintiff never raised any other complaints about unlawful or unethical behavior prior to the Provost's decision to deny tenure. *Id.* (Pl. Dep. 102:4-14). Accordingly, neither the University nor Dr. Fang knew about any whistleblowing for which they could retaliate against during the tenure review process – because no such whistleblowing occurred.

      **6.**    **Count V: Breach of Contract - Against University**

      **a.**    **Plaintiff was not guaranteed tenure.**

      "To state a claim for breach of contract, plaintiff must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and

Page 36 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

defendant's breach resulting in damage to plaintiff." *Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996) (internal citation and quotation omitted). Plaintiff bases his breach of contract claim on the April 23, 2014 renewal letter that stated that if his two papers were "accepted for publication *in the very near future*, [it] could, as part of your overall research portfolio, lead to a favorable tenure decision." Amended Complaint ¶ 163; Reeves Dec., Ex. 18 (UO1127-1128) (emphasis in original).

The 2014 renewal letter did not give rise to a contract concerning tenure. The authors of the letter—the LCB Deans—had no authority to bind the University to a contract, and even Plaintiff acknowledges that only the Provost could award tenure. Further, the letter states he *could* receive tenure not that he *would*. Plaintiff cannot credibly claim that his 2014 renewal letter constituted a contract guaranteeing him tenure. *See Davis v. Oregon State Univ.*, 591 F.2d 493, 496 (9th Cir. 1978) (established tenure standards superseded oral contract from department chairman about tenure promotion).

### b.    Plaintiff breached the contract.

Plaintiff's employment with the University was governed by the contracts he signed. Reeves Dec., Ex. 3 (UO1154), Ex. 5; (Zhang_DS191-193), and Ex. 19 (Zhang_DS210-211). As such, he agreed to comply with University administrative rules and polices. Reeves Dec., Ex. 1 (Pl. Dep. 61:5-9; 83:8-18; 87:24-88:2; 98:23-99:9; 262:19-263:8). Plaintiff claims that Dr. Fang subjected him to unethical and discriminatory conduct, but he failed to report this behavior, as required. Plaintiff breached the agreement when he failed to report. Plaintiff cannot seek to enforce an agreement that he breached. *See Slover*, 144 Or. App. at 570 (1996) (plaintiff must

demonstrate full performance to succeed on breach of contract claim). As such,

Plaintiff's breach of contract claim should be dismissed.

E.    **CONCLUSION**

      Defendants move the Court to grant summary judgment in Defendants'

favor. In the alternative, Defendants seeks summary judgment on each of Plaintiff's

claims.

DATED:  February 27, 2019.

                          BULLARD LAW

                          By s/ Liani J. Reeves
                            Liani J. Reeves, OSB No. 013904
                            lreeves@bullardlaw.com
                            Kalia J. Walker, OSB No. 154434
                            kwalker@bullardlaw.com
                            503-248-1134/Telephone
                            503-224-8851/Facsimile
                            Attorneys for Defendants
                            University of Oregon and Yue Fang

Page 38 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it does not exceed 11,000 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED: February 27, 2019.

BULLARD LAW

By s/ Liani J. Reeves
    Liani J. Reeves, OSB No. 013904
    lreeves@bullardlaw.com
    Kalia J. Walker, OSB No. 154434
    kwalker@bullardlaw.com
    503-248-1134/Telephone
    503-224-8851/Facsimile
    Attorneys for Defendants
    University of Oregon and Yue Fang

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2019 I served the foregoing

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** on:

David Griggs
Griggs Law Group PC
4900 SW Griffith Drive, Suite 165
Beaverton, OR  97005

Adam Carter
R. Scott Oswald
The Employment Law Group, PC
888 17th St. NW, 9th Floor
Washington D.C., DC 20006

☑      by **electronic** means through the Court's Case Management/Electronic Case File system, which will send automatic notification of filing to each person listed above.

☐      by **mailing** a true and correct copy to the last known address of each person listed.  It was contained in a sealed envelope, with postage paid, addressed as stated above, and deposited with the U.S. Postal Service in Portland, Oregon.

☐      by causing a true and correct copy to be **hand-delivered** to the last known address of each person listed.  It was contained in a sealed envelope and addressed as stated above.

☐      by causing a true and correct copy to be delivered **via overnight courier** to the last known address of each person listed.  It was contained in a sealed envelope, with courier fees paid, and addressed as stated above.

☐      by **faxing** a true and correct copy to the last known facsimile number of each person listed, with confirmation of delivery.  It was addressed as stated above.

☐      by **emailing** a true and correct copy to the last known email address of each person listed, with confirmation of delivery.

s/ Liani J. Reeves
Liani J. Reeves, OSB No. 013904
Kalia J. Walker, OSB No. 154434
Attorneys for Defendants
University of Oregon and Yue Fang

Page 1    CERTIFICATE OF SERVICE