**Liani J. Reeves, OSB No. 013904**
lreeves@bullardlaw.com
**Kalia J. Walker, OSB No. 154434**
kwalker@bullardlaw.com
Bullard Law
200 SW Market Street, Suite 1900
Portland, OR 97201
503-248-1134/Telephone
503-224-8851/Facsimile

Attorneys for Defendants University of Oregon and Yue Fang

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **DR. YONGLI ZHANG,** | Case No. 6:18-cv-00232-MK |
| Plaintiff, | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **UNIVERSITY OF OREGON, and YUE FANG,** | |
| Defendants. | |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   CHRONOLOGY OF PLAINTIFF'S COMPLAINTS..............................................2

III.  LAW AND ARGUMENT ........................................................................................5

      1.    Jurisdictional Issues ..................................................................................5

      2.    Count I: Race and National Origin Discrimination - Title VII
           and ORS 659A.030 ..................................................................................10

      3.    Count II: Retaliation - Title VII and ORS 659A.030 Against
           University ..................................................................................................23

      4.    Count III: Race and National Origin Discrimination Claims -
           42 U.S.C. § 1981 and 1983 against University and Dr. Fang..... 24

      5.    Count V: Breach of Contract Against University........................27

IV.   CONCLUSION...................................................................................................... 29

## Cases

*Akinjide v. Univ. of Maryland E. Shore*, No. CIV.A. DKC 09-2595, 2011 WL 4899999, at *8 (D. Md. Oct. 13, 2011) ............................................. 25

*Delaware State Coll. v. Ricks*, 449 U.S. 250 (1980) ................................. 5, 9, 23

*Diaz v. American Telephone & Telegraph*, 752 F.2d 1356 (9th Cir. 1985) ..................... 13

*France v. Johnson*, 795 F.3d 1170 (9th Cir. 2015) ............................................ 13

*Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968, 972 (8th Cir. 1994) ................................ 11

*Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) ................... 10, 12, 26

*Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) ...................................... 20

*Manatt v. Bank of Am.*, NA, 339 F.3d 792, 798 (9th Cir. 2003) ...................................... 25

*Martin v. Auburn Univ. Montgomery*, 908 F. Supp. 2d 1259, 1268 (M.D. Ala. 2012) .... 11

*Peters v. Lieuallen*, 746 F.2d 1390, 1393 (9th Cir. 1984) ................................................. 26

*Quraishi v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, 2013 WL 2370449, at *2 (D. Md. May 30, 2013) ...................................... 25

*Repp v. Oregon Health Scis. Univ.*, 972 F. Supp. 546, 548 (D. Or. 1997) ........................ 9

*Runyon v. McCrary*, 427 U.S. 160, 168 (1976) .................................................... 24

*Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 ................................................. 25

*Siring v. Oregon State Board of Education ex rel. Eastern Oregon University*, 927 F.Supp.2d 1030 (D. Or. 2012) ............................................. 22

*Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996) ...... 28

*Tapp v. St. Louis Univ.*, 78 F. Supp. 2d 1002, 1016 (E.D. Mo. 2000) ............................. 12

*Vimegnon v. Oregon Health & Sci. Univ.,* No. 3:16-CV-02304-HZ, 2017 WL 3429394, at *7 (D. Or. Aug. 8, 2017) ...................................... 23

## Statutes

42 U.S.C. § 1981 and 1983 ............................................................................ 24

ORS Chapter 659A ............................................................................................. 9

# I. INTRODUCTION

Plaintiff did not receive tenure at the University of Oregon (the "University") because he failed to meet one of the three requirements for tenure—a sufficient number of high quality scholarly contributions. After multiple levels of independent review that were consistent with the University's well established processes, the Provost denied Plaintiff's tenure application on that basis. The Provost's decision to deny tenure does not mean Plaintiff is a bad teacher, or even that he is a bad researcher. It simply means Plaintiff did not complete enough research, measured by publications in top peer-reviewed journals, to demonstrate that he should be given life-time tenure at the University of Oregon's Lundquist College of Business.

Plaintiff refuses to accept the Provost's decision, and attacks it with an elaborate—and shifting—discrimination theory based on speculation that one of his former colleagues, Dr. Yue Fang, manipulated the University's tenure process to thwart Plaintiff's success because Plaintiff failed to act sufficiently Chinese by not acceding to Dr. Fang's demands.[1] But other than his own speculation, Plaintiff has failed to produce any actual evidence that Dr. Fang or the University discriminated or retaliated against him. Rather, Plaintiff tries to defeat summary judgment by using inflammatory words like "abuse," "doom," "prey," "groom," and "revenge" to describe Dr. Fang's conduct. However, in the seven years he spent at the University, Plaintiff *admittedly* never once uttered those words out loud or in writing to anyone at the University—not to Dr. Fang,

---

[1] The University and Dr. Fang deny that Dr. Fang engaged in unethical, discriminatory or retaliatory behavior as Plaintiff alleges. But the Court need not resolve credibility determinations at this time because petitioner's claims are based on speculation, not facts that demonstrate or infer discrimination or retaliation.

not to his Department Head or his Dean, not to Human Resources, and not to the Provost. He can re-characterize his speculations with inflammatory language, but the flaws remain the same; Plaintiff offers nothing more than speculation in support of his claims. That is not sufficient to survive summary judgment.

## II.     CHRONOLOGY OF PLAINTIFF'S COMPLAINTS

Plaintiff began working at the University in 2009. He alleges he was subjected to discriminatory conduct by Dr. Fang from 2010 to 2013. A thorough review of the evolution of Plaintiff's complaints demonstrates that he did not make any allegations of discrimination until after he was denied tenure. Even then, his inflammatory and inaccurately pleaded allegations against Dr. Fang did not fully surface until he filed this lawsuit three years after his tenure was denied.

In February 2016, Plaintiff learned that the Dean of the Lundquist College of Business ("LCB") would be recommending that the award of tenure be denied. In response, Plaintiff wrote a letter to the Provost's office arguing for his tenure case. *Declaration of Liani Reeves in Support of Defendants' Reply Memorandum* ("Second Reeves Dec."), Ex. 1 (Zhang_DS185-87). In this letter, Plaintiff does not mention discrimination, race, national origin or retaliation. *Id.* Nor does Plaintiff mention Dr. Fang. *Id.* Instead, the letter focuses on what he perceived to be the nullification of his external reviewer feedback and his research productivity. *Id.*

The Provost denied tenure in May 2016. In July 2016, Plaintiff wrote a letter to the Provost appealing his tenure decision. *See Declaration of Liani Reeves in Support of Defendants' Motion for Summary Judgment* ("Reeves Dec.") [ECF No. 31], Ex. 34 (UO6-12). In this letter, Plaintiff states that the "department and college

Page 2     DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

committees' assessment of [his] research contain[ed] factual errors and fundamental discrimination." *Id.* At the conclusion of his letter, he attributes the "substantial discrimination and unfairness" in his tenure case to 1) the department committee's decision to downgrade the quality of his scholarship and 2) the external reviewer support that was replaced through a cohort analysis. In his 7-page letter, Plaintiff does not mention race, national origin, retaliation or Dr. Fang.

Nearly a year later, in May 2017, Plaintiff sent his Tort Claim Notice to the University. Second Reeves Dec., Ex. 2 (Zhang_DS182-83). Plaintiff claimed that his work was nullified though a cohort analysis performed by the Department Committee, "some of whom made unethical requests to Dr. Zhang which he refused." *Id.* Again, there is still no mention of Dr. Fang or any allegations that Dr. Fang discriminated against Plaintiff due to their shared Chinese heritage.

Only when Plaintiff filed his agency complaints in October 2017 did allegations against Dr. Fang finally emerge. Second Reeves Dec., Ex. 3 (Zhang_DS464-474). Plaintiff alleged what he characterized as "unethical requests" by Dr. Fang and that Dr. Fang was motivated to negatively influence Plaintiff's tenure case because he refused those requests. *Id.* During the course of this litigation, Plaintiff had to concede that many of his allegations of Dr. Fang's requests (later included in his Amended Complaint, ECF No. 11) were inaccurately pleaded. For example, Plaintiff claimed that Dr. Fang "forced" him to loan Dr. Fang $40,000 for a home purchase. ECF No. 11 at ¶ 40. After being confronted with bank records and emails, Plaintiff testified at his deposition that $40,000 was a "typo," that it was a "request" not a "demand," and that he thought the request was "inappropriate" not "unethical." Reeves Dec., Ex. 1 (Pl. Dep.

Page 3   DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY
         JUDGMENT

192:16-194:7; 198:24-199:4). Plaintiff also claimed that Dr. Fang "forced" Plaintiff to assist Dr. Fang's son with a research project in 2009. ECF No. 11 at ¶ 38. Plaintiff testified at his deposition that the project occurred in 2010, not 2009, and that he never objected to the request. Reeves Dec., Ex. 1 (Pl. Dep. 163:24-164:1). Plaintiff claimed that Dr. Fang "forced" him to conduct a research project with his daughter in 2010. ECF No. 11 at ¶ 39. In his deposition, Plaintiff conceded that any independent study with Dr. Fang's daughter was in 2013, and that again, he never objected to such a request. Reeves Dec., Ex. 1 (Pl. Dep. 165:25-166:6). Plaintiff's agency complaint was the first time he made any specific allegations against Dr. Fang. He repeated them in his lawsuit complaint. Those allegations were hastily pled at best and, as outlined in Defendants' Motion for Summary Judgment, not supported by the evidence.

Now, in his response to Defendants' Motion for Summary Judgment, Plaintiff's allegations against Dr. Fang are rife with inflammatory language but contain no substance. Plaintiff alleges Dr. Fang "abused" his unique position to "doom" Plaintiff's tenure application and that Dr. Fang "prey[ed] on his junior faculty" to "groom"[2] Plaintiff with unethical requests and then sought "revenge" when Plaintiff failed to acquiesce to his demands. Pl.'s Resp. pp. 1, 31-32.[3] Though Plaintiff has re-characterized his allegations against Dr. Fang, he still offers nothing new to support them—other than speculation and shock and awe tactics that should be disregarded.

_____

[2] Plaintiff is not a child, and this is not child sex assault case. This choice of vocabulary is neither necessary nor appropriate for this case.

[3] All page references to Defendants' Motion for Summary Judgment and Plaintiff's Response refer to the page of the document as contained in the motion, rather than the ECF page number.

### III.    LAW AND ARGUMENT

####    1.    Jurisdictional Issues

#####        a.    Plaintiff's claims are barred for failing to timely meet the administrative requirements under ORS 659A.030 and Title VII and the Oregon Tort Claims Act.

Plaintiff's Title VII and state claims are barred. The Provost denied Plaintiff's tenure on May 4, 2016. Plaintiff filed a complaint with BOLI on October 2, 2017 and with EEOC on October 9, 2017. Both were filed a year and a half after his tenure decision—barring his claims under ORS 659A.030 and Title VII. Further, Plaintiff's tort claim notice was dated May 26, 2017, barring state claims based on allegations that occurred prior to 180 days of the notice.

As briefed in Defendants' Motion for Summary Judgment, the United States Supreme Court addressed this very question in *Delaware State Coll. v. Ricks*, 449 U.S. 250 (1980). Plaintiff inaccurately argues that the authority to grant tenure rests with the University's President, not the Provost. Plaintiff goes so far to assert that "the Provost's decisions were just like all of the other steps in the tenure process – there [sic] were manifestly not the final decision on tenure." Pl.'s Resp. p. 17. This assertion has no support in the actual evidence in this case and conflicts with Plaintiff's admitted understanding of the Provost's authority to grant or deny tenure.

The Collective Bargaining Agreement ("CBA"), which established the controlling process for Plaintiff's tenure case, specifically states that the University's Provost has the authority to grant or deny tenure. *See* Reeves Dec., Ex. 9. Article 20 of the CBA, "Tenure Review and Promotion," includes the following language:

- Section 1: "*The award of tenure requires an express grant by the Provost* communicated in writing to the bargaining unit faculty member and signed by the Provost." Reeves Dec., Ex. 9, p. 2 (emphasis supplied).

- Section 19: "*The Provost has plenary authority to award or deny tenure.* The candidate will be notified in writing *of the Provost's decision*. The letter accompanying the decision will contain an explanation of the reasons underlying *the Provost's decision*, if the decision is to deny tenure or promotion." Reeves Dec., Ex. 9, p. 43 (emphasis supplied).

Plaintiff testified that he reviewed Article 20 related to tenure and promotion. Second Reeves Dec., Ex. 4 (Pl. Dep. 94:14-16).

The Office of the Provost and Academic Affairs website includes guidelines and procedures on the tenure process and links to the specific unit policies. Second Reeves Dec., Ex. 5 (Coltrane 30b6 Dep. 44:12-45:6); Ex. 6 (UO 1603-1607). The "Promotion & Tenure" process posted on the Office of the Academic Affairs website outlines: *"The provost has plenary authority to award or deny tenure.* By May 1 whenever possible, the candidate will be notified in writing of *the provost's decision*. The letter accompanying the decision will contain an explanation of the reasons underlying *the provost's decision*, if the decision is to deny tenure or promotion." Reeves Dec., Ex. 8, p. 4 (emphasis supplied). Plaintiff testified that he reviewed the University's Promotion & Tenure process. Second Reeves Dec., Ex. 4 (Pl. Dep. 86:15-19).

The LCB policy on Tenure and Promotion states that the "Office of Academic Affairs and *the Provost makes promotion and tenure decisions*[.]" Reeves

Dec., Ex. 7, p. 2 (emphasis supplied). The tenure process outlined by LCB policy clearly explains that all prior levels of review make "recommendations":

- "Tenured faculty from the candidate's department...evaluate the candidate's file and submit a written *recommendation*." Reeves Dec., Ex. 7, p. 3 (emphasis supplied).

- "The department head provides a separate evaluation and *recommendation*, and both the department's *recommendation* and the *recommendation* of the department head are included in the file that is forwarded to the College personnel Committee." Reeves Dec., Ex. 7, p. 3 (emphasis supplied).

- "The College Personnel Committee evaluates the candidate's file and provides a written *recommendation* to the office of the dean." Reeves Dec., Ex. 7, p. 3 (emphasis supplied).

- "The dean and/or associate dean of the college in turns makes a *recommendation* to the provost on behalf of the college[.]" Reeves Dec., Ex. 7, p. 3 (emphasis supplied).

Plaintiff testified that he understood the LCB policy on Tenure and Promotion governed his tenure process. Second Reeves Dec., Ex. 4 (Pl. Dep. 119:17-24).

The undisputed facts above regarding the tenure and promotion process establishes that the Provost makes the ultimate decision on tenure. The decision on Plaintiff's tenure was made consistent with that process. On May 4, 2016, Provost Coltrane notified Plaintiff of his decision to deny tenure in writing with an explanation of the reasons underlying his decision. *See* Reeves Dec., Ex. 32 (Zhang444). None of those facts are reasonably subject to dispute.

To save his untimely claims, Plaintiff attempts to conflate an appeal process with the decision on tenure. Article 21 of the CBA governs an "Appeal from the Denial of Tenure or Promotion." Reeves Dec., Ex. 33 (Zhang_DS48; 99-103). Article 21 provides "the only process through which a bargaining unit faculty member may appeal *a decision of the Provost* to deny tenure or promotion." Reeves Dec., Ex. 33, p. 2 (emphasis added). That article outlines several appeal mechanisms – review by the Promotion and Tenure Review Appeal Committee ("PTRAC") (Sections 6-9) and Final Appeal to the President (Section 11). Section 11 provides:

> If the bargaining unit faculty member disagrees *with the Provost's decision* on appeal, the faculty member may appeal in writing to the President of the University within 10 days of the receipt of the Provost's written decision. The President will notify the bargaining unit faculty member in writing of his or her decision within 21 days of receipt of the written appeal. The President' decision is final and binding and is not subject to grievance, arbitration or further appeal." Reeves Dec., Ex. 33, p. 5 (emphasis added).

Plaintiff argues that this language makes the President the final decision-making authority because he could have overruled the Provost's decision through the grievance process. Pl.'s Resp. p. 17. But a close review of Article 21 makes it clear that both the PTRAC and the President are reviewing a decision the Provost already made. Stated differently, although Article 21 allows an appeal of the Provost's decision, that does not alter the fact that the Provost is the person who makes the decision to grant tenure at the University.

Plaintiff is advancing the same argument advanced by the EEOC in *Ricks* and rejected by the Supreme Court. The possibility that the college's decision could be overturned through a grievance procedure did not change the Court's analysis about

when the limitations period commenced. *See Ricks,* 449 U.S. at 261; *see also Repp v. Oregon Health Scis. Univ.*, 972 F. Supp. 546, 548 (D. Or. 1997) (limitations period was not tolled while dismissed medical student pursued school's internal grievance procedure). Likewise, the President's role in the tenure appeals process in Plaintiff's case did not toll the statute of limitations.

*Ricks* illustrates that the key date is the day when the University communicated its "official position" on Plaintiff's tenure—that was on May 4, 2016 when the only person with the plenary authority to award tenure notified Plaintiff that he would not be receiving tenure. Even Plaintiff acknowledged in his deposition his clear understanding that the Provost had sole decision-making authority over tenure. Reeves Dec., Ex. 1 (Pl. Dep. 111:3-10; 112:7-10). Plaintiff tries to undermine his own crucial admissions by arguing that they were a "mistaken or unschooled understanding of a matter of law." Pl.'s Resp. p. 19. Plaintiff's alleged misunderstanding of when he thought a statute of limitations began to run as a matter of law does not change the facts that under controlling University policy and the CBA, the Provost made the decision to deny Plaintiff tenure, and the statute of limitations began to run on that date.

Plaintiff did not timely file his administrative complaints with BOLI or the EEOC within the required timelines under ORS Chapter 659A or Title VII. Therefore his claims are time-barred. Further, Plaintiff advances absolutely no argument on his failure to meet the jurisdictional requirements under the Oregon Tort Claims Act, necessitating dismissal of all Oregon statutory claims.

///

///

Page 9    DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY
             JUDGMENT

2. **Count I: Race and National Origin Discrimination - Title VII and ORS 659A.030**

   a. **Plaintiff has no evidence of discrimination based on race or national origin.**

Plaintiff's race discrimination claims fail because he cannot establish a prima facie case on any of his shifting theories of discrimination.[4] Plaintiff alleges Dr. Fang discriminated against Plaintiff when he refused to "succumb to Fang's demands" and then Dr. Fang manipulated the tenure process so that the Provost would deny Plaintiff's tenure. ECF No. 11 at ¶ 132. Plaintiff speculates that his refusal to Dr. Fang to adhere to Chinese cultural norms concerning elders (based on alleged events that occurred in 2010 to 2013) ultimately led to the negative tenure decision by the Provost in 2016. Plaintiff, however, does not establish a prima facie case in support of this claim.

To prove discrimination, Plaintiff ultimately needs to show that similarly situated individuals outside his protected class "were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *See Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (internal quotations omitted). Plaintiff has no such evidence.[5]

---

[4] Plaintiff appears to argue that he has a prima facie case of discrimination because a white professor was awarded tenure and he was not. Pl.'s Resp. p. 21-22. However, that is not the theory of discrimination Plaintiff has advanced in this case. Even if the court accepted Plaintiff's revised discrimination theory, he cannot prove that Dr. Pardoe (who earned tenure some eight years earlier) was remotely similar to Plaintiff as discussed later in Defendants' Reply.

[5] Defendants do not concede that Plaintiff was qualified to be promoted to associate professor with tenure. As discussed in Defendants' opening brief, Plaintiff did not have sufficient scholarship to be awarded tenure. See Def's Mot. p. 12.

913/160 00906965 V 1

Plaintiff relies on a former professor, Dr. Iain Pardoe, as a similarly-situated individual to establish Dr. Fang's racial discrimination. He alleges that Dr. Pardoe is white and was granted tenure in 2007. But Dr. Pardoe is not an appropriate comparator because he was awarded tenure eight years before Plaintiff applied, and two years before Plaintiff even started working at the University in 2009. *See Martin v. Auburn Univ. Montgomery*, 908 F. Supp. 2d 1259, 1268 (M.D. Ala. 2012) (comparator not similarly situated when tenure cycle was six years before plaintiff's application). Moreover, different people were involved in the two professors' tenure decisions. *See Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968, 972 (8th Cir. 1994) ("When different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.") (internal citation and quotations omitted).

None of the individuals who reviewed Plaintiff's case at the Department level in 2015 (Dr. Fang, Dr. Zhibin Yang, and Dr. Nagesh Murthy) reviewed Dr. Pardoe's case in 2007. Dr. Fang did not serve on that committee; Dr. Zhibin Yang was not even at the University; and Dr. Murthy was reviewed for tenure that same year. *Declaration of Yue Fang in Support of Defendants' Reply Memorandum* ("Second Fang Dec.") ¶ 8. Further, the ultimate decision maker was different; Dr. Coltrane was not the Provost in 2007. Second Reeves Dec., Ex. 5 (Coltrane 30b6 Dep. 6:11-22). And it is common for tenure standards to evolve over time as universities compete against each other to improve their programs. Second Reeves Dec., Exs. 5 & 7 (Coltrane 30b6 Dep. 82:19-83:24); (Coltrane Dep. 47:2-12). In sum, the circumstances surrounding Dr. Pardoe's and Plaintiff's situations are not sufficiently similar for Dr. Pardoe to be an appropriate

comparator.[6] *See Tapp v. St. Louis Univ.*, 78 F. Supp. 2d 1002, 1016 (E.D. Mo. 2000) (holding that another professor was not similarly situated to plaintiff when the tenure committee was different, the school had different administration, and the decisions were separated by six years).

Nor does Plaintiff offer any other evidence giving rise to an inference of discrimination. *See Hawn*, 615 F.3d at 1156. Plaintiff admits that the basis for Dr. Fang's alleged mistreatment (the social hierarchy within the Chinese culture) was never discussed. Pl.'s Resp. p. 21. In other words, Plaintiff does not have any evidence that his Chinese culture or ancestry was a factor in Dr. Fang's alleged efforts to prevent his tenure promotion. As noted in Defendants' opening brief, Plaintiff admitted that Dr. Fang never discussed Chinese culture requiring respect for elders and Dr. Fang never made any statements to suggest that he believed Plaintiff violated these cultural norms. Def.'s Mot. p. 23. Plaintiff conveniently attempts to explain his lack of evidence by citing the same cultural norms that underlie the basis of his unsupported claims, stating "this is not a topic that is discussed or overtly spoken of, but it is an accepted expected part of Chinese culture and interpersonal relationships." Pl.'s Resp. p. 21. Plaintiff's explanation of a lack of evidence does not turn that lack of evidence into evidence.

---

[6] Likewise, Plaintiff's attempt to undermine Dr. Pardoe's research is misplaced. He offers nothing more than his own opinion regarding the merits of Dr. Pardoe's research record. See Pl.'s Resp. p. 13. Plaintiff's opinion is not entitled to any deference. See Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 225, (1985) ("When judges are asked to review the substance of a genuinely academic decision...they should show great respect for the faculty's professional judgment."). Mr. Carter's declaration references an Exhibit 13. There was no Exhibit 13 attached and to the extent it purports to be evidence, there is no foundation to support it.

Moreover, Plaintiff has no evidence that Dr. Fang treated any of the other Chinese faculty in the OBA department similarly, and those are the other persons in the department most comparable to Plaintiff. Notably, Plaintiff concedes that Dr. Fang was involved in the favorable tenure decisions for two other Chinese professors. Pl.'s Resp. p. 22. Plaintiff tries to undermine this fact by arguing that these professors did not have statistics specialties. However, Plaintiff is not alleging that he was discriminated against because he was a statistics professor (nor could he as that is not a protected class), so this distinction is irrelevant. And Plaintiff provides no explanation for why Dr. Fang would not have had the same alleged expectations of the other Chinese faculty in the department regardless of their specialty. Further, Plaintiff's reliance on *Diaz v. American Telephone & Telegraph*, 752 F.2d 1356 (9th Cir. 1985) is misplaced. Defendants do not argue that Plaintiff cannot establish his prima facie case solely because other Chinese professors were awarded tenure. Rather, Plaintiff's discrimination claim fails because he does not offer any facts showing discrimination based on race or national origin. But the fact that other Chinese professors in Plaintiff's and Dr. Fang's department were awarded tenure during Dr. Fang's employment undermines Plaintiff's claim that unlawful discrimination was a factor in his tenure denial.

Even assuming Plaintiff could establish a prima facie case, Dr. Fang was not the ultimate decision-maker, so he must link Dr. Fang's allegedly discriminatory intent to the Provost's final decision. Plaintiff cannot rely on *France v. Johnson*, 795 F.3d 1170 (9th Cir. 2015) in support of his cat's paw theory. In *France*, the plaintiff presented evidence that his colleague influenced the promotion decision. The plaintiff

913/160 00906965 V 1

showed that his supervisor established the new position for which plaintiff applied and the ultimate decision-maker deferred to the supervisor's recommendations in deciding not to promote plaintiff. *Id.* at 1176. Plaintiff, however, does not offer any evidence that Dr. Fang unduly influenced the tenure process or the Provost's decision to deny tenure. This was discussed in Defendants' opening brief and will not be repeated here. *See* Def.'s Mot. p. 26. Unable to offer evidence of a connection between Dr. Fang and the subsequent levels of review, Plaintiff simply states "there is no doubt" Dr. Fang was involved in the decision-making process that resulted in Plaintiff being denied tenure. *See* Pl.'s Resp. p. 23. Defendants do not argue that Dr. Fang had no involvement in the tenure review process; Dr. Fang was part of one of several committees that reviewed Plaintiff's application for tenure and provided a recommendation to the Provost. Rather, Defendants contend that Dr. Fang did not have disproportionate or discriminatory influence on the Department Committee's or the Provost's decision—because he did not.

Plaintiff argues that Dr. Fang had undue influence on the process by convincing the OBA Department to downgrade his publications by using the "applied statistics" and "general statistics" journals; using a "faulty cohort analysis"; and negating positive recommendations from external reviewers. Pl.'s Resp. p. 22. Plaintiff correctly states that "only Fang and Koreisha were statisticians." Pl.'s Resp. p. 22. As an initial matter, Plaintiff's statement demonstrates one of the many flaws of his own argument— Dr. Koreisha was indeed a statistician and was one of many individuals who evaluated Plaintiff's research as insufficient. Plaintiff has made no arguments that Dr. Koreisha is Chinese (he is not) or his decision was guided by some unspoken cultural expectations. Addressing each of Plaintiff's alleged bases for discrimination, all of them are flawed.

*"Applied" versus "General"*

Plaintiff argues that the quality of his research was downgraded because Dr. Fang came up with the distinction between "applied statistics" and "general statistics" journals. He assumes that Dr. Fang, as a statistician, "in the inventing process, Yue Fang played a leading role." Reeves Second Dec., Ex. 4 (Pl. Dep. 246:23-247:4). The distinction between "applied" and "general" has only ever mattered to Plaintiff. The record shows that other review levels—and most importantly the Provost— did not consider Plaintiff's publications which were in "applied statistics" journals to be lesser quality. The issue with Plaintiff's research was with the *quantity*.

Dr. Murthy testified that the reason for describing the two sets of journals was to "distinguish between what many schools view as the top, top journals, and the list of journals we have, which is very different for the most part." Reeves Second Dec., Ex. 8 (Murthy Dep. 105:4-25). Indeed, the expansion of top journals to include "applied" journals helped Plaintiff, not hurt him, because it placed more of Plaintiff's articles in journals the department would consider top journals. Dr. Pangburn testified that some of Plaintiff's journals were not considered by some lists as top journals.

> So rather than potentially making a mistake of referring of a journal as an A- that should be on A, we thought it would be safer to not use that designation, A-, and just referral to them as top – top journals. So even the ones that would perhaps undisputedly be deemed As, we decided not to call them As either. We just used two different groups of journals. Because one group was more of a general audience and the other group was a niche-shot audience, but they were top journals to those audiences. Reeves Second Dec., Ex. 9 (Pangburn Dep. 52:20-53:13).

Dr. Koreisha testified that he did not differentiate the *quality* between "premiere general" versus "premier applied": "I didn't say that there isn't any

distinction. I said that one of them — one set contained more theoretical-type work than the others. In terms of classifying them, whether they're A's or B's, we believe that, you know, an applied statistics journal is an A just like an anything else in an A." Reeves Second Dec., Ex. 10 (Koreisha Dep. 117:17-118:3). Dr. Coltrane testified that the distinction made no difference to him. "General statistic journals are somewhat different than applied statistics journals, even though they are picking the top ones in both of those areas. There is a distinction between them, and it's a piece of evidence. It doesn't mean that you need necessarily all the pubs in one column or the other. It's just somebody's research productivity." Reeves Second Dec., Ex. 5 (Coltrane 30b6 Dep. 85:3-21)

Plaintiff's obsession with the distinction between "applied" versus "general" statistics journals was of no consequence to others. It had no bearing on the outcome of his tenure case. It is not evidence of discrimination.

*Cohort Analysis*

Further, Plaintiff's reliance on the cohort analysis as being uniquely done in Plaintiff's case and conjured up by Dr. Fang is unsupported by any facts and is simply wrong. Plaintiff deposed many witnesses in this case. Many confirmed that a cohort analysis is a common tool to assess a candidate's scholarship as compared to his or her peers. Moreover, it was Dr. Murthy who "insisted" on a cohort analysis at the OBA level, not Dr. Fang. Reeves Dec., Ex. 13 (Murthy Dep. 33:7-14). Dr. Murthy testified that Plaintiff's case is not the only case where this analysis was done and that "I have actually done that consistently for all colleagues, is to fight for — when number is small, why we still should look for every single reason where we can justify within the standards of

what we expect in the department." *Id.* (Murthy Dep. 29:2-17). Dr. Koreisha testified that cohort analyses were used in other cases than Plaintiff's. Reeves Second Dec., Ex. 10 (Koreisha Dep. 113:22-25). At the LCB level, Professor Gutierrez "took the lead" in the cohort analysis. Reeves Second Dec., Ex. 9 (Pangburn Dep. 119:24-120:8) Dr. Pangburn testified that it is common for a cohort analysis to be used during a tenure review. *Id.* (Pangburn Dep. 39:19-40:2; 126:6-8). "[W]e do this quite often. I only – this is one of several cases where I do a cohort analysis with quite a few people in each case." *Id.* Dr. Coltrane testified that cohort analyses are used "to get an objective measure of accomplishment across the different ways that scholars can do that." Reeves Second Dec., Ex. 5 (Coltrane 30b6 Dep. 27:21-28:6).

Plaintiff's continued insistence that the cohort analysis is evidence of discrimination because it was only applied to him cannot be supported by the record and is not evidence of discrimination.

*External Reviewers*

Plaintiff also places undue weight on the fact that the external reviewers recommended that he should receive tenure. However, they are recommendations only, and many of the University faculty who reviewed Plaintiff's tenure application testified that they felt that the external review letters were shallow and lacking critical analysis:

- "I think is [sic] my opinion and I believe is also the opinion of the committee members is that the letters we receive were very shallow and they did not address some of the major issues – major questions that we asked. Primarily is that they do no address whether or not he would be promoted at their institutions or comparable intuitions as the University

of Oregon. And there were claims that were made that were very unsubstantiated in those letters. And they were very superficial without evidence." Second Reeves Dec., Ex. 10 (Koreisha Dep. 66:14-24).

- "...I saw the letters, but I was not very impressed with the assessment, but in a few - in the sense of how they were not stating exactly why they were recommending or saying certain things. Typically, in external review letters I see a very clear analysis of when somebody recommends. They show a lot of due diligence." Second Reeves Dec., Ex. 8 (Murthy Dep. 25:24-26:5).

- "And this was largely because the external letter writers did an inadequate job describing a comparison. And when they did, and I believe two of them said, he's in the top ten percent, that was it. There was no justification, no comparison. Where other external reviewers were offering to go into some detail and even list names of people..." Second Reeves Dec., Ex. 11 (Terborg Dep. 15:21-16:3).

Indeed, the lack of analysis performed in the external review letters in large part led to the cohort analysis by the internal reviewers. Dean Terborg noted that he felt the LCB did "exemplary work attempting to answer the question of how does a candidate's file compare to others in the cohort as one part of the overall evaluation." Second Reeves Dec., Ex. 11 (Terborg Dep. 15:5-16-23). Dr. Coltrane noted that the external letters justified the cohort analysis in Plaintiff's case:

> In the course of internal analysis and deliberation, it is common to examine comparisons with others in the candidate's field, whether or not they have been specifically drawn by the external reviewers. Thus, we

> cannot fault Professor Zhang's departmental or LCB colleagues for carrying out a cohort analysis, not can we fault their selection process for this cohort, which is clearly established and justified in the dossier."
> Reeves Second Dec., Ex. 12 (Zhang 779-782).

The external review letters were one of many pieces of information in Plaintiff's review process. The fact that they were viewed by the internal reviewers as shallow—and therefore not accepted without independent review—is not evidence of discrimination.

### b. Plaintiff fails to establish pretext.

Nor can Plaintiff establish that the University's legitimate reason for tenure denial was pretextual. Plaintiff argues that the University's rationale is called into question because Defendants have altered their position about why Plaintiff was denied tenure. The evidence does not support this. The consistent reason, and the only reason, for Plaintiff's tenure denial was because he failed to publish a sufficient number of scholarly articles.

Throughout the review process, quantity—not quality—was repeatedly the concern cited about Plaintiff's case. The OBA Department Committee noted that it was "impressed with the quality of Dr. Zhang's work," but "we have significant concerns with regards to Professor Zhang's research productivity. One of our primary concerns is that Dr. Zhang's research productivity is on the low side...We wish that Dr. Zhang had managed the research pace more aggressively given the constraint of a five year tenure clock." Reeves Dec., Ex. 23 (Zhang 339-347). The Department Head Dr. Koreisha assessed that Plaintiff's research had "great potential" but "his tenure clock has seemingly ticked much too quickly." Reeves Dec., Ex. 26 (UO 2514-2520). His two top tier publications, without more, were not sufficient. *Id.* The LCB College Committee found that "Dr. Zhang's research output has not been particularly productive or

impactful, though his papers are of a high quality." Reeves Dec., Ex. 27 (Zhang 788-795). Dean Terborg agreed with the LCB reviewers that when comparing Plaintiff's research productivity against a cohort of his peers from other universities, "his record noticeably lags that benchmark." Reeves Dec., Ex. 28 (Zhang 776-778). Dr. Coltrane's decision also was based on the overall quantity of scholarship:

> In Zhang's case the two A publications were a great indication that he could do quality work, it's just that there were only two of them, and they came very late at the time he was here at the university. What they like to see is earlier publication and more things closer to being accepted in the top journals, whether they're in general journals or applied journals or third-year journals. We want to see more activity. We want to see more papers that are going close to accepted. We want to see more citations. And new research trajectories, new projects, grants, if they're available in one's field. Those are the things we look for." Reeves Second Dec., Ex. 7 (Coltrane Dep. 24:13-25).

The University has consistently explained to Plaintiff that his deficiencies were quantity, not quality. Plaintiff's argument that there has been a changing explanation of why he was denied tenure is incorrect. To the contrary, the University's consistent and unchanging explanation undermines Plaintiff's argument that his lack of scholarship was not the true reason the Provost denied tenure. *See Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) (finding no pretext when the employer's reasons for termination were neither inconsistent nor conflicting).

Effectively conceding the consistency in the University's position with respect to the tenure decision, Plaintiff goes back in time and cites a performance review from the 2010-11 academic year and testimony regarding Plaintiff's 2013 third-year review. The University does not disagree that quality was mentioned in those earlier reviews because both the quality and quantity were deficient up to that point. Indeed,

Plaintiff was only given a one-year renewal contract at his third year review rather than the full three years because he had not met the research standards in either respect. *See* Reeves Dec., Ex. 17 (UO 1952-1955). The LCB Deans encouraged Plaintiff to "concentrate your efforts on those projects that have the highest probability for success and are nearly completed" and that his "priority next year is to show tangible progress with your research...You must demonstrate the ability to repeatedly have your research submitted, reviewed, and accepted for publication in 'A' journals." *Id.* This was good advice to Plaintiff, and does not show that the University took an inconsistent position two years later during Plaintiff's tenure application.

Plaintiff also argues that the University's rationale was pretextual because he did what was requested of him, yet his tenure was still denied. Pl.'s Resp. p. 24. But that is not what Plaintiff did. First, the tenure review standards were clearly set forth in the CBA between Plaintiff and the University. Reeves Dec., Ex. 33 (Zhang_DS48; 99-103). Second, Plaintiff struggled to produce sufficient scholarship throughout his employment. *See* Reeves Dec., Ex. 17 (UO 1952-1955). Moreover, the research award he received was based on scholarship for that year alone. Second Reeves Dec., Ex. 13 (Koreisha 30b6 Dep. 47:10-17). Presented with his insufficient research record, the Department Committee conducted a cohort analysis out of fairness to Plaintiff – they did not discount his research.

Finally, Plaintiff's argument about conflicts of interest is not evidence that the University's proffered explanation is unworthy of credence. Plaintiff offers no evidence to establish that a conflict existed other than his opinion. Further, Plaintiff made no reports of any alleged discriminatory conduct or unethical requests by Dr. Fang

until after his tenure was denied. He had never reviewed any applicable policies or made any effort to determine if Dr. Fang's requests were unethical. Reeves Dec., Ex. 1 (Pl. Dep. 86:15-22; 87:15-18; 98:23-99:4). Plaintiff never raised any complaints about unlawful or unethical behavior prior to the Provost's decision to deny tenure.[7] *Id.* (Pl. Dep. 102:4-14).

*Siring v. Oregon State Board of Education ex rel. Eastern Oregon University*, 927 F.Supp.2d 1030 (D. Or. 2012), does not support Plaintiff's position regarding pretext. In *Siring*, a college personnel committee hastily met about plaintiff's employment termination before the final decision was communicated to the Plaintiff. *Id.* at 1061. That did not occur in Plaintiff's case. Plaintiff has no evidence of a suspicious meeting between the Department Committee before testifying before PTRAC. Dr. Fang testified that no such meeting occurred. Second Reeves Dec., Ex. 14 (Fang Dep. 163:15-18). Yet, even if they did, that meeting would have been related to the appeals process which happened after the University denied Plaintiff's tenure application. Accordingly, Dr. Fang's desire to appear with the Department Committee at the PTRAC hearing is not evidence of prextext. In fact, Dr. Fang only wanted to appear before PTRAC with the entire committee because they provided a recommendation on Plaintiff's case as a group. *Id.* (Fang Dep. 162:14-24). That actually undermines Plaintiff's theory of Fang's undue influence.

---

[7] Plaintiff appears to argue that Dr. Koreisha's involvement in Plaintiff's case constituted a conflict of interest. Pl.'s Resp. p. 25. Dr. Koreisha is not a named defendant in this case and Plaintiff does not allege that he unlawfully influenced his tenure review or decision.

3. **Count II: Retaliation - Title VII and ORS 659A.030 Against University**

   a. **Plaintiff cannot establish a claim for retaliation.**

Plaintiff's retaliation claims fail because the only timely alleged protected activity occurred after the Provost denied tenure. In his response, Plaintiff offers two instances of alleged protected activity: refusing to add Dr. Fang's name to his single-author paper and the July 16, 2016 appeal letter. Pl.'s Resp. p. 27. Plaintiff's reliance on both of these examples fails to establish a claim for retaliation. First, even if the Court finds that Plaintiff's refusal to add Dr. Fang to his paper was protected activity, this event took place in June 2013 – more than *two years* before Plaintiff applied for tenure. Zhang Dec. ¶ 4. *See Vimegnon v. Oregon Health & Sci. Univ.,* No. 3:16-CV-02304-HZ, 2017 WL 3429394, at *7 (D. Or. Aug. 8, 2017) (holding that "[a] time lag of two years is too long to raise an inference of causation.")

Likewise, the July 2016 appeal letter fails to provide a basis for Plaintiff's retaliation claim. Plaintiff received his complete tenure dossier in May 2016, Zhang Dec. ¶ 12, and Dr. Fang's alleged misconduct occurred years before. However, Plaintiff attempts to cast his appeal letter as a report of discrimination by Dr. Fang, despite never mentioning Dr. Fang, race, or national origin. More importantly, the letter came after the Provost had already denied tenure in May 2016. Therefore, Plaintiff cannot link his alleged protected activity to the adverse tenure decision. To save his retaliation claim, Plaintiff again argues that the final tenure decision was in January 2017, which followed his alleged report of discrimination in July 2016. (Even then, he still did not make any allegations of discrimination against Dr. Fang.) However, for Plaintiff to prevail, the Court would need to disregard binding precedent in *Ricks* and accept Plaintiff's

913/160 00906965 V 1

unsupported conclusion that the President, rather than the Provost, was the final authority on tenure at the University. Accordingly, Plaintiff's retaliation claims should be dismissed.

4. **Count III: Race and National Origin Discrimination Claims - 42 U.S.C. § 1981 and 1983 against University and Dr. Fang.**

a. **The University is immune from suit under 42 U.S.C. § 1981 and 1983.**

Plaintiff's 42 U.S.C. §§ 1981 and 1983 claims fail as a matter of law. The University is not a "person" and immune from suit under these statutory schemes. Def.'s Mot. p. 36. Notably, Plaintiff does not offer any authority undermining the University's immunity and essentially concedes that Plaintiff can only impose liability on the University through its officials and not directly. Pl.'s Resp. p. 30.

b. **Dr. Fang is entitled to qualified immunity.**

Dr. Fang has qualified immunity against Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983.[8] As a threshold matter, § 1981 only applies to race-based discrimination. *Runyon v. McCrary*, 427 U.S. 160, 168 (1976). However, Plaintiff's allegations against Dr. Fang appear to be based on their shared national origin and the traditional Chinese culture they both grew up in, rather than discriminatory animus merely because Plaintiff is Chinese. Plaintiff argues that a broad interpretation of race should be applied to Plaintiff's claim; however, he relies on an unspoken aspect of Chinese culture without offering any evidence of how Plaintiff treated other Chinese

---

[8] Defendants acknowledge that a University official can be sued in his or her official capacity for prospective injunctive relief; however, Dr. Fang is immune from suit on the basis of qualified immunity. Ex Parte Young, 209 U.S. 123 (1908).

faculty. Additionally, Plaintiff alleges that Dr. Fang took advantage of him because he was a "recent immigrant" more likely to rely on Dr. Fang for guidance. Am. Compl. ¶ 43. But a person could be a recent immigrant from any country, not just China.

Moreover, "the line between discrimination based on 'ancestry or ethnic characteristics,' and discrimination based on 'place or nation of ... origin,' is not a bright one." *Saint Francis Coll. v. Al-Khazraji,* 481 U.S. 604, 614 (Brennan, J. concurrence). Indeed, several federal courts have dismissed § 1981 claims similar to Plaintiff's – those devoid of evidence pertaining to discrimination on the basis of ethnicity. *See, e.g.*, *Akinjide v. Univ. of Maryland E. Shore*, No. CIV.A. DKC 09-2595, 2011 WL 4899999, at *8 (D. Md. Oct. 13, 2011) (holding that Section 1981 did not apply to a professor's claim based on his Nigerian ethnicity as opposed to his Nigerian origin); *Quraishi v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, 2013 WL 2370449, at *2 (D. Md. May 30, 2013) (mimicking plaintiff's accent was national origin, not race, discrimination); *cf. Manatt v. Bank of Am.*, NA, 339 F.3d 792, 798 (9th Cir. 2003) (co-workers pulling eyelids to mock physical characteristics of Chinese plaintiff could constitute race, as opposed to national origin, discrimination). Dr. Fang cannot be held personally liable for a § 1981 claim that is based on their shared Chinese culture and immigration to the United States, rather than Plaintiff's ethnicity.

Even if the Court permits Plaintiff to proceed with his § 1981 claim based on his national origin theory,[9] Dr. Fang is still entitled to qualified immunity. To prevail

---

[9] In Federation of African American Contractors v. City of Oakland, 96 F.3d 1204, 1214 (9th Cir. 1996), the Ninth Circuit recognized an independent cause of action under 42 U.S.C. § 1981. However, Plaintiff appears to rely on 42 U.S.C. § 1983 solely as a means to remedy the alleged violation of his § 1981 rights. Pl.'s Resp. p. 28.
[Footnote continued on next page]

on his § 1981 discrimination claim, Plaintiff must establish a prima facie case of intentional race discrimination under the Title VII framework. *See Peters v. Lieuallen*, 746 F.2d 1390, 1393 (9th Cir. 1984) (because plaintiff failed to prove intentional discrimination under Title VII, claims under §§ 1981 and 1983 must also fail). Therefore, to establish a prima facie case of discrimination, Plaintiff must show (1) he was a member of a protected class; (2) he was qualified for his position and performing his job satisfactorily; (3) he experienced an adverse employment action; and (4) that "similarly situated individuals outside [his] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (internal citation and quotation marks omitted).

Dr. Fang is entitled to qualified immunity because his actions did not violate Plaintiff's "clearly established rights." To be clear, Defendants are not arguing that it was not a "clearly established right" for Plaintiff to be free from discrimination based on his race or national origin. However, Dr. Fang had to be on notice that the activities in which he engaged were activities that constituted intentional discrimination under "clearly established" law. Plaintiff claims that Dr. Fang used personal requests to "groom" Plaintiff into adding his name to Plaintiff's scholarship. Pl.'s Resp. p. 32. When

---

[Continued from previous page]

Accordingly, Plaintiff's § 1983 claim should be dismissed. If the Court does not dismiss Plaintiff's § 1983 claim on these grounds, this claim cannot survive because Plaintiff fails to establish that Dr. Fang intentionally discriminated against him. See Stones v. Los Angeles Cmty. Coll. Dist., 796 F.2d 270, 275 (9th Cir. 1986) (plaintiff who fails to establish intentional discrimination cannot assert a claim for race discrimination under 42 U.S.C. § 1983 claim).

his alleged plan failed, Dr. Fang influenced the tenure process so that Plaintiff would not be awarded tenure. As an initial matter, Plaintiff offers no evidence of "grooming" at all, let alone "grooming" intended to cause Plaintiff to list Dr. Fang as an author on a paper. Moreover, Plaintiff fails to offer *any evidence* demonstrating that Dr. Fang improperly influenced the Provost's decision to deny tenure. In fact, the record establishes that the opposite was true, and that Dr. Fang wanted Plaintiff to be awarded tenure. Fang Dec. ¶ 18. Further, the personal requests Plaintiff cites were in the context of simple friendship and collegiality where both men assisted each other. Reeves Second Dec., Ex. 15 (UO3519-3520; UO3522-3523; UO4580-4581). Defendants have not found any case that "clearly establishes" that asking a colleague for a loan, or to assist a child with a research project, or to help each other on research —even assuming Dr. Fang did so because of their shared Chinese ancestry — constitutes intentional discrimination.

In short, Dr. Fang cannot be held personally liable for facially innocuous conduct where Plaintiff fails to offer evidence of discriminatory intent or action.

### 5.    Count V: Breach of Contract Against University[10]

To defeat summary judgment on his contract claim, Plaintiff attempts to conflate his April 2014 reappointment letter and his actual employment contracts. Plaintiff's breach of contract claim is based on the Reappointment Letter he received on April 23, 2014. ECF No. 11 at ¶ 163. He alleges that the University breached this agreement, when he was not awarded tenure. ECF No. 11 at ¶ 165.  However, in his Response, Plaintiff concedes that his employment was not governed by this

---

[10] Plaintiff has withdrawn his fourth claim, Whistleblower Retaliation, against the University.

reappointment letter. Pl.'s Resp. p. 33. Accordingly, his breach of contract claim should be dismissed because he acknowledges that the reappointment letter has no bearing on his employment with the University. *See Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996) (plaintiff must allege the existence of a contract for a breach of contract claim).

To the extent Plaintiff seeks to rely on his employment contracts, these agreements cannot form the basis for his claim because they are not related to tenure decisions. Moreover, Plaintiff failed to report the allegedly discriminatory treatment he experienced. As noted in the opening brief, Plaintiff never reported that Dr. Fang subjected him to discriminatory conduct over the course of his employment at the University. Plaintiff claims that his July 2016 letter to the Provost reported discrimination. This letter was not a report of discrimination. Plaintiff did not mention race or national origin and focuses on what he perceived to be an unfair evaluation of his research record. More importantly, Plaintiff's report came after the Provost denied Plaintiff's tenure on May 4, 2016. Plaintiff cannot allege that the University breached an agreement based on discriminatory conduct that he failed to report. As such, Plaintiff's breach of contract claim should be dismissed.

///

///

///

///

///

## IV.    CONCLUSION

Plaintiff's claims boil-down to allegations that Dr. Fang discriminated against Plaintiff because they were both Chinese, and that Dr. Fang then retaliated against Plaintiff because he was not sufficiently submissive as younger Chinese person should be to an older Chinese person. But no evidence shows that Dr. Fang even thought about those issues.  They are pure speculation on Plaintiff's part. Accordingly, for the foregoing reasons, Defendants respectfully request that the Court grant summary judgment against all of Plaintiff's claims.


DATED:  April 17, 2019.

By s/Liani J. Reeves
    Liani J. Reeves, OSB No. 013904
    lreeves@bullardlaw.com
    503-248-1134/Telephone
    503-224-8851/Facsimile
    Attorneys for Defendants
    University of Oregon and Yue Fang

913/160 00906965 V 1

**CERTIFICATE OF COMPLIANCE**

This brief complies with LR 7-2(b), because it is 35 pages or less, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

DATED: April 17, 2019.

BULLARD LAW

By s/Liani J. Reeves
    Liani J. Reeves, OSB No. 013904
    lreeves@bullardlaw.com
    503-248-1134/Telephone
    503-224-8851/Facsimile
    Attorneys for Defendants
    University of Oregon and Yue Fang

# CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2019 I served the foregoing

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT on:

> David Griggs
> Griggs Law Group PC
> 4900 SW Griffith Drive, Suite 165
> Beaverton, OR  97005
>
> Adam Carter
> R. Scott Oswald
> The Employment Law Group, PC
> 888 17th St. NW, 9th Floor
> Washington D.C., DC 20006

☑     by **electronic** means through the Court's Case Management/Electronic Case File system, which will send automatic notification of filing to each person listed above.

☐     by **mailing** a true and correct copy to the last known address of each person listed.  It was contained in a sealed envelope, with postage paid, addressed as stated above, and deposited with the U.S. Postal Service in Portland, Oregon.

☐     by causing a true and correct copy to be **hand-delivered** to the last known address of each person listed.  It was contained in a sealed envelope and addressed as stated above.

☐     by causing a true and correct copy to be delivered **via overnight courier** to the last known address of each person listed.  It was contained in a sealed envelope, with courier fees paid, and addressed as stated above.

☐     by **faxing** a true and correct copy to the last known facsimile number of each person listed, with confirmation of delivery.  It was addressed as stated above.

☐     by **emailing** a true and correct copy to the last known email address of each person listed, with confirmation of delivery.

> s/ Liani J. Reeves
> _____
> Liani J. Reeves, OSB No. 013904
> Attorneys for Defendants
> University of Oregon and Yue Fang

Page 1     CERTIFICATE OF SERVICE