UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| DR. YONGLI ZHANG,<br><br>                              Plaintiff,<br><br><br>v.<br><br><br>UNIVERSITY OF OREGON and YUE FANG, an individual<br><br>                              Defendants. | Case No.: 6:18-cv-00232-MK<br><br>FINDINGS AND RECOMMENDATION<br><br>RE: PLANTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

**KASUBHAI, Magistrate Judge:**

Plaintiff brought this action against the University of Oregon and Yue Fang, alleging race and national origin discrimination and retaliation under Title VII and ORS 659A, violations of 42 U.S.C. § 1981 and § 1983, whistleblower retaliation under ORS 659A and common law breach of contract. Before the Court are Plaintiff's Motion for Partial Summary Judgment and Defendants Motion for Summary Judgment. The Court heard oral argument.

For the reasons set forth below, Defendants' Motion for Summary Judgment should be **GRANTED** as to Count I, Count II, Count III, and Count V, and **DENIED** as to Count IV as

moot; Plaintiff's Motion for Partial Summary Judgment should be **DENIED** as moot.  The

Complaint should be dismissed.

## BACKGROUND

Plaintiff and Defendant Yue Fang ("Fang") are both Americans of Chinese national

origin. *See* Fang Decl. ¶¶ 2, 4 (ECF No. 33); *see also* Zhang Decl. ¶¶2-3 (ECF No. 41-3).

During the time period at issue, Plaintiff and Fang were employees of the University of Oregon

("University") at the business school, Charles H. Lundquist College of Business ("LCB"), in the

Department of Operations and Business Analytics ("OBA"). *See* First Am. Compl. (ECF No.

11); Answer ¶¶ 19, 20 (ECF No. 16).  The University is a public university in Eugene, Oregon.

First Am. Compl. ¶ 12 (ECF No. 11); Answer ¶ 12 (ECF No. 16).

Plaintiff started employment at the University as a visiting assistant professor in the OBA

Department in July 2009 and became a Tenure Track Assistant Professor in February 8, 2010.

Pl.'s Mot. for Partial Summ. J., Exs. 22-23 (ECF No. 28-24, 28-25).  His specialty is in statistics.

Zhang Dep. 13:18-21 (ECF No. 28-4).  In July 2015, Plaintiff submitted his application for

promotion to Associate Professor with Tenure. First Am. Compl. ¶ 34 (ECF No. 11); Answer ¶

34 (ECF No. 16).

Fang is an associate professor of statistics and served on the OBA Department's three-

member Faculty Review Committee ("Department Committee") that reviewed tenure

applications, including Plaintiff's tenure application. Fang Decl. ¶ 6 (ECF No. 33).  Fang was the

only member of the Department Committee who specialized in statistics. *See id.* at ¶ 7.  Between

2010 and 2014, Fang served as the Department Chair of the OBA. *Id.* at ¶ 5.  After Fang

obtained his tenure in 2002, he did not publish any significant research with which to secure a

full professorship. *Id.*; Fang Dep. 46:14-21 (ECF No. 28-11)

Plaintiff and Fang were the only two statistics professors of Chinese national origin at the OBA Department. *See* Fang Decl. ¶ 6 (ECF No. 33). Plaintiff offered evidence that in Chinese culture, Plaintiff is expected to show respect to Fang, who is an elder and a person of a senior or superior status. Zhang Decl. ¶ 2 (ECF No. 41-3). Plaintiff explained that wishes and requests of elders are complied with without question under the social hierarchy in Chinese culture. *Id.* Throughout their time as colleagues, Plaintiff claims that he gave deference to Fang's seniority. Pl.'s Mot. for Partial Summ. J. 3 (ECF No. 28-1). For example, Plaintiff referred to Fang as "Professor Fang" or "Dr. Fang," and Fang referred to Plaintiff by his first name "Yongli." *Id.* at Ex. 11 (ECF No. 28-13); *Id.* at Ex. 2, Zhang Dep. 148:22-149:21 (ECF No. 28-4). As part of Fang's duties for being the OBA Department Chair, Fang was responsible for providing supporting paperwork to the U.S. Citizenship and Immigration Services, and he wrote a letter in support of Plaintiff's H-1B visa (work visa) application and then permanent residency application at Plaintiff's request. Zhang Decl. ¶ 3 (ECF No. 41-3); Defs.' Reply, Ex. 15, 3-4 (ECF No. 43). There is no evidence that links Fang's administrative visa duties with any demands Fang made of Plaintiff.

Plaintiff testified that Fang took advantage of this power dynamic between them and made unethical, demeaning, and discriminatory demands of Plaintiff. Reeves Decl. Ex. 1, Zhang Dep. 148:1-174:1 (ECF No. 31). Specifically,

- In or around October 2010, Fang asked Plaintiff to complete a high school science project for Fang's son. *See* Zhang Dep. 150:8-152: 5 (ECF No. 28-4); *see also* Zhang Decl. ¶ 5 (ECF No. 41-3).

- In Fall of 2013, Fang asked Plaintiff to enroll Fang's high-school aged daughter in Plaintiff's "independent study" class; Plaintiff complied and assigned the grade of

an "A" to Fang's daughter even though she "did nothing" for the class. Zhang
Dep. 165:14-169:22 (ECF No. 28-4).

- Around July 2010, Fang borrowed $8,000[1] from Plaintiff for Fang's purchase of a
  new home. Fang Dep. 16:1-17:3 (ECF No. 28-11); Reeves Decl. Ex. 1, Zhang
  Dep. 193:16-194:13 (ECF No. 31).

- Around December 25, 2010, while Plaintiff was in China with limited access to
  emails, Fang emailed Plaintiff asking for a recommendation letter for Fang's son
  who was applying for colleges. Zhang Dep. 152:7-25 (ECF No. 28-4).  Fang went
  ahead and drafted a recommendation letter on behalf of Plaintiff and submitted
  the recommendation letter without Plaintiff's signature, telling Plaintiff "your
  recommendations have been sent to colleges. I will give you more details after
  you are back. You don't have to response [sic] any of their emails/phone calls if
  there are any." Pl.'s Mot. for Partial Summ. J. Ex. 11 (ECF No. 28-13).

- In June 2013, Fang requested Plaintiff to include Fang's name on a research paper
  that Plaintiff was close to finishing, but Fang had made no contribution to the
  paper.  Zhang Dep. 212: 12-215:24 (ECF No. 28-4).  Plaintiff testified that Fang
  said to him: "We should help each other.  And I put your name.  So if I do
  something, I put your name.  You do something, put my name.  Okay.  Everyone
  will have two papers." Reeves Decl. Ex. 1, Zhang Dep. 228: 13-16 (ECF No. 31).
  Plaintiff "indicated to [Fang that he] didn't want to collaborate with him" by
  putting off Fang's request. Zhang Dep. 229: 8-16 (ECF No. 28-4).  Fang testified

---

[1] The First Amended Complaint alleges the amount to be $40,000. First Am. Compl. ¶ 40 (ECF No. 11).

that he and Plaintiff "did collaborate work, but [they] didn't publish." Fang Decl. 149:15-24 (ECF No. 28-11).

In February 2010 when Plaintiff became a Tenure Track Assistant Professor, Plaintiff testified that Dr. Sergio Koreisha ("Koreisha"), the OBA Department Chair at the time, told him that publication of two articles in "A" level journals was the research and publication requirement for granting tenure within the OBA. Zhang Dep. 106:17-19 (ECF No. 28-4). Koreisha, as the OBA Department Chair, received no training for management, employee relations or workplace discrimination, and no formal training on the tenure process. *See* Koreisha Dep. 15:3-11, 22:15-24 (ECF No. 28-21). The OBA department had no formally established guidelines as to what constitutes an "A" journal. Terborg Dep. 34:6-35:1 (ECF No. 28-23).

On April 23, 2014, the University issued a Reappointment Recommendation letter to Plaintiff that renewed his contract for an additional two years for him to be evaluated for tenure in the 2015-2016 academic year. Pl.'s Mot. for Partial Summ. J. Ex. 28, Reappointment Recommendation Letter (ECF No. 28-30). The letter stated that if two of Plaintiff's research papers under review at the time were selected for publication in the *Journal of Business and Economic Statistics* and the *Journal of the American Statistical Association* respectively, the publication "could … lead to a favorable tenure decision." *Id.* at 2.

A favorable recommendation for the grant of tenure under the LCB policy requires "the candidate to have a significant record of high quality scholarly contributions to his or her field …" where "[a] significant record of high quality scholarship is interpreted to mean that the candidate's research is of a quality commensurate with work published in the top journals in the candidate's discipline, and that leading scholars in the candidate's field along with departmental colleagues attest to the importance of the overall contribution of the candidate's research." *Id.* at

Ex. 18 (ECF No. 28-20).  In June 2015, Plaintiff received the Goulet Outstanding Research

Award from the University for his publications. Pl.'s Mot. for Partial Summ. J. Exs. 3-4 (ECF

Nos. 28-5, 28-6).  The following month in July 2015 when Plaintiff submitted his tenure

application, his research record consisted of five publications accepted in academic journals, two

of which appeared in journals that Plaintiff claims to be of "A" level. Zhang Dep. 310:25-311:3

(ECF No. 28-4).  However, in October 2015, Koreisha encouraged Plaintiff to withdraw his

tenure application. Zhang Dep. 106:13-14 (ECF No. 28-4).  Plaintiff later learned that all the

external reviewers were in favor of his tenure application. *Id.* at 106:9-109:21; Koreisha Dep.

22:5-15 (ECF No. 28-22).  Plaintiff did not withdraw his tenure application.

On December 4, 2015, the OBA Department Committee issued a decision letter,

recommending Plaintiff's tenure application be denied, citing Plaintiff's lack of productivity

because he had only "two publications in premier applied statistics journals." Pl.'s Mot. for

Partial Summ. J. Ex. 1 at 6 (ECF No. 28-3).  Additionally, the letter states that Plaintiff "has not

yet published in the premier four general statistics journals" which "is highly desired[.]" *Id.*

Koreisha concurred with the Department Committee's decision in his letter to LCB's Interim

Dean James Terborg. Pl.'s Mot. for Partial Summ. J. Ex. 31 (ECF No. 28-33).

Plaintiff claims that the Department Committee's finding ignored the statement in

Plaintiff's 2014 Reappointment Letter that he only needed two premier publications, which did

not include the distinction of *applied* verses *general* statistics journals. *See* Pl.'s Mot. for Partial

Summ. J. Ex. 28 (ECF No. 28-30).  Plaintiff claims that the Department Committee ignored the

recommendations of the external reviewers who recommended tenure to Plaintiff. *See* Pl.'s Mot.

for Partial Summ. J. Ex. 5 (ECF No. 28-7).  Plaintiff notes that the University had granted tenure

to Professor Iain Pardoe, who is white and from the United Kingdom, although he neither had

two publications in "A level" journals nor any publications in general statistics journals. *See* Zhang Dep. 116:14-117:23 (ECF No. 28-4); *see also* Pl.'s Mot. for Partial Summ. J. Ex. 25 (ECF No. 28-27).

Plaintiff's application was then reviewed by the Lundquist College Personnel Committee ("College Committee"). *See id.* at Ex. 32 (ECF No. 28-34).  Dr. Mike Pangburn, a member of the College Committee, consulted a reputable statistician about the reputation of the journals that published Plaintiff's work and concluded "two of the journals [Plaintiff] has published in are indeed considered by some as legitimate A's." *Id.*  Nonetheless, the College Committee labeled the journals as "Group II" and denied Plaintiff's tenure. *Id.* at Ex. 33 (ECF No. 28-35).

When asked at deposition why Plaintiff believed Fang was responsible for Plaintiff's tenure denial, Plaintiff offered the following:

> I have very strong evidence. … [Y]ou can see the internal discussion among college committee members.  When we talk about my case, okay, Yongli has only two A minus publication. [sic]  After some consulting, [sic] external top statisticians, oh Yongli does have two A-level publications.  Yongli's case is becoming more complicated.

> This … file included in my tenure package, so you can see everyone talk[sic] about A, A minus, B plus.  Finally[,] in the college committee report, they used group one, group two, group three.  This is a very smart trick invented by Yue Fang and other members in the [D]epartment [C]ommittee. This is my strong evidence.

> …

> I am very confident the [C]ollege [C]ommittee decision was seriously affected by the [D]epartment [C]ommittee. Otherwise, how can I explain these two concerns? Journal rating, cohort analysis, were proposed, were discovered, were recognized by the [C]ollege [C]ommittee but finally they did nothing?

Reeves Decl. Ex. 1 Zhang Dep. 267:9-25, 269:1-8 (ECF No. 31); Zhang Decl. ¶¶ 10-11 (ECF No. 41-3).

Fang testified that he and the other Department Committee members tried to recommend an extension of at least one more year "because we want Dr. Yongli Zhang to be successful." Reeves Decl. Ex. 14, Fang Dep. 37:13-38:5 (ECF No. 31).  He testified that "I cannot be influenced … because I'm a good friend to [sic] Yongli. And … if [he does] not satisfy the college standard, I cannot just say yes.  Although … I hope Yongli be [sic] successful." Fang Dep. 149:6-14 (ECF No. 41-1).  Dr. Nagesh Murthy, a member of the Faculty Review Committee, testified that Fang "never had even once [sic] any negative comment while we were assessing. He let us speak our judgment on whether … the record was sufficient[.]" Reeves Decl. Ex. 13, Murthy Dep. 72:10-12 (ECF No. 31).

On February 5, 2016, Terborg agreed with the College Committee and recommended denying tenure. *Id.* at Ex. 34 (ECF No. 28-36).

Next, Plaintiff's application was reviewed by the University Faculty Personnel Committee ("University Committee"), which reached the opposite conclusion and recommended granting tenure. *Id.* at Ex. 6 (ECF No. 28-8).  The University Committee identified problems in the Department Committee's findings: (a) the tenure criteria were vague; (b) the standard of the quality of publication and journals does not appear in the tenure standards, resulting in Plaintiff being informed of a different standard; (c) the Department Committee failed to place sufficient weight on the external reviewers' opinion which matched Plaintiff's area of expertise more closely than that of the internal reviewers. *Id.*

Despite the University Committee's recommendation for tenure, on May 4, 2016, Provost Scott Coltrane denied Plaintiff's application. *Id.* at Ex. 7 (ECF No. 28-9).

Article 21 of the University Collective Bargaining Agreement ("CBA") "provides the only process through which a bargaining unit faculty member may appeal a decision of the

Provost to deny tenure or promotion." Reeves Decl., Ex. 33, 2, Section 1. Scope of Article. (ECF No. 31). After a bargaining unit faculty member submits a written statement of appeal to the Provost, the Provost "shall prepare a written response and forward the appeal, together with his or her response, to the Chair of the University Promotion and Tenure Review Appeal Committee (PTRAC)." Reeves Decl., Ex. 33, 3, Sections 5-6 (ECF No. 31). After the PTRAC's review, the PTRAC will prepare a written report and submit it to the Provost. Reeves Decl., Ex. 33, 3-4, Sections 8-9 (ECF No. 31). The Provost will consider the PTRAC report and issue a decision. Reeves Decl., Ex. 33, 4-5, Section 10 (ECF No. 31).

The CBA further provides:

> If the bargaining unit faculty member disagrees with the Provost's decision on appeal, the faculty member may appeal in writing to the President of the University within 10 days of the receipt of the Provost's written decision. The President will notify the bargaining unit faculty member in writing of his or her decision within 21 days of receipt of the written appeal. The President's decision is final and binding and is not subject to grievance, arbitration or further appeal.

Reeves Decl., Ex. 33, 5, Section 11. Final Appeal to the President. (ECF No. 31).

On July 15, 2016, Plaintiff wrote an appeal letter to Coltrane. In the letter, Plaintiff stated that "the department and college committees' assessment of my research contains factual errors and fundamental discrimination." Pl.'s Mot. for Partial Summ. J. Ex. 35 (ECF No. 28-37). At the University, the barriers for reporting discrimination are low, which allows a faculty member to write a letter to their supervisor or the dean to report discrimination. *Id.* at Ex. 16 Matella Dep. 27:10-28:16 (ECF No. 28-18). Provost Coltrane did not believe discrimination was the right term for what Plaintiff was claiming, did not think the letter was reporting discrimination of a protected class, and did not follow up with Plaintiff to inquire about his report of discrimination. *Id.* at Ex. 45 Coltrane Dep. 48:10-52:24 (ECF No. 28-47). Provost Coltrane took no action to investigate discrimination following the receipt of Plaintiff's letter. *Id.*

On Plaintiff's appeal to the PTRAC, the PTRAC held a formal hearing in July 2016 to evaluate Plaintiff's appeal and requested Fang's presence as a witness. *See id.* at Ex. 15 (ECF No. 28-17).  Fang attempted to recuse himself, explaining that he felt "uncomfortable to represent the department in the hearing" because he "ha[s] been a very close friend with Yongli." *Id.*; *see* Fang Dep. 146:16-149:14 (ECF No. 28-11).  In Plaintiff's declaration, he states that "[d]uring the ensuing hearing, the three members of the [Department] Committee vehemently declined to be interviewed separately, insisting instead to be interviewed as a group." Reeves Decl. Ex. 42, Zhang Decl. ¶ 99 (ECF No. 31).

On November 18, 2016, after completing its investigation and review, the PTRAC recommended grant of Plaintiff's tenure. Pl.'s Mot. for Partial Summ. J. Ex. 36 (ECF No. 28-38). However, on December 12, 2016, Provost Coltrane affirmed his original decision denying tenure after considering the PTRAC's recommendation. *Id.* at Ex. 37 (ECF No. 28-39).

On December 21, 2016, Plaintiff appealed to the University President, who affirmed the Provost's decision on January 11, 2017. *Id.* at Exs. 38-39 (ECF No. 28-40, 28-41).  The President's decision letter states that "[a]s per Article 21, Section 11 of the Collective Bargaining Agreement, this decision is final and binding and is not subject to grievance, arbitration, or further appeal." *Id.* at Ex. 39 (ECF No. 28-41).  Without tenure, Plaintiff's employment contract with the University ended in July 2017. First Am. Compl. ¶ 119 (ECF No. 11); Answer ¶ 119 (ECF No. 16).

On October 2, 2017, Plaintiff cross-filed a complaint with the Bureau of Labor and Industries ("BOLI") and the U.S. Equal Employment Opportunity Commission ("EEOC"). Pl.'s Mot. for Partial Summ. J. Ex. 40 (ECF No. 28-42).  On January 2, 2018, Plaintiff received the

notice of right to file a civil suit from BOLI. *Id.* at Ex. 41 (ECF No. 28-43).  On February 5,

2018, Plaintiff filed this complaint.

## PLAINTIFF'S CLAIMS

Plaintiff brings five claims.  Count I alleges Title VII and ORS 659A race and national

origin discrimination against the University.  Count II alleges Title VII and ORS 659A

retaliation against the University.  Count III alleges that the University and Defendant Fang

violated 42 U.S.C. §§ 1981 and 1983 based on race and national origin discrimination.  Count IV

alleges whistleblower retaliation against the University in violation of ORS 659A.200 *et seq.*

Count V alleges breach of contract by the University.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The

movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not

thereby relieved of his own burden of producing in turn evidence that would support a jury

verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  In determining a motion for

summary judgment, "the judge must view the evidence in the light most favorable to the

nonmoving party." *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

In the context of employment cases, the Ninth Circuit has held that "[a]s a general matter,

the plaintiff in an employment discrimination action need produce very little evidence in order to

overcome an employer's motion for summary judgment." *Chuang v. University of California

Davis, Bd. Of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000) (citing *Schnidrig v. Columbia

Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)).  "The requisite degree of proof necessary to

establish a *prima facie* case for Title VII … on summary judgment is minimal and does not even

need to rise to the level of preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted).

## DISCUSSION

### I. Defendants' Motion for Summary Judgment

#### A. Jurisdictional Issues

Defendants argue that Counts I and II are time barred, citing Title VII, Oregon Revised Statutes ("ORS") Chapter 659A and Oregon Tort Claims Act ("OTCA"). Defs.' Mot. for Summ. J. 19-21 (ECF No. 30).  Under Title VII, if a person aggrieved has initially instituted proceedings with an agency, a charge shall be filed within three hundred days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e-5(e)(1).  Under Oregon law, a BOLI complaint "must be filed no later than one year after the alleged unlawful practice." Or. Rev. Stat. § 659A.820(2).  Under the OTCA, a notice of claim must be given to the public body "within 180 days after the alleged loss or injury." Or. Rev. Stat. § 30.275(2)(b).

Defendants assert that when Provost Coltrane denied Plaintiff's tenure on May 4, 2016, the time to file a complaint and to give notice under Title VII, ORS Chapter 659A and the OTCA started to run. Defs.' Mot. for Summ. J. 19-21 (ECF No. 30); Defs.' Resp. to Pl.'s Mot. for Partial Summ. J. 2-4 (ECF No. 38).  Therefore, Defendants move to dismiss Plaintiff's claims because: (1) Plaintiff filed his complaint with EEOC on October 9, 2017 and beyond the 300-day filing period under Title VII, (2) he filed a complaint with BOLI on October 2, 2017 and beyond the one-year filing period under ORS Chapter 659A, and (3) he gave notice to the University on May 26, 2017 and beyond the 180-day period under the OTCA. Defs.' Mot. for Summ. J. 19-21 (ECF No. 30).  Plaintiff counters that his filings are all timely because January 11, 2017, the date the University President denied his tenure, is the operative date for the calculation of statutory

filing periods under Title VII, ORS Chapter 659A and the OTCA. Pl.'s Resp. to Defs.' Mot. for Summ. J. 16-19 (ECF No. 41).

The question is whether the statute of limitations started to run from the date of Provost Coltrane's decision on May 4, 2016 or from the date of the University President's decision on January 11, 2017.

Both parties cite the Supreme Court decision of *Delaware State Coll. v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), where the Supreme Court considered whether a college professor timely filed a complaint alleging that his tenure denial was due to national origin discrimination.  In *Ricks*, the Supreme Court held that the professor's claims began to run when he was informed of the tenure decision, regardless of the grievance process that followed. *Id.* at 261.  The Supreme Court found that "the Board of Trustees had made clear well before September 12 that it had formally rejected Ricks' tenure bid," and that "[t]he June 26 letter [from the Board of Trustees] itself characterized that as the Board's 'official position.' " *Id.*  Although the Board's June 26 letter "indicated a willingness to change its prior decision if Ricks' grievance were found to be meritorious," "entertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative." *Id.*  "[T]he pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." *Id.* (citation omitted).  "The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made." *Id.* (citation omitted).

Defendants read this holding as support for barring Plaintiff's claims.  Defendants assert that an appeal of the Provost's decision does not change the fact that the Provost is the person

who makes the decision to grant tenure at the University. Defs.' Reply 8 (ECF No. 43).  Both the

PTRAC and the President only review a decision the Provost already made. *Id.*

Plaintiff contends however, to trigger the statute of limitations, a plaintiff needs an

"unequivocal notice" that the decision was "final," "followed by no further process," and

"communicated in a manner such that no reasonable person could think there might be a retreat

or change in position prior to the termination of the employment decision." Pl.'s Reply 2-3 (ECF

No. 42) (citing *Hoesterey v. City of Cathedral City*, 945 F.2d 317, 319-20 (9th Cir. 1991)).

Plaintiff also suggests that *Ricks* is distinguishable from his case. *Id.* at 2-3; Pl.'s Resp. 17-18

(ECF No. 41).  First, the *Ricks* plaintiff filed a grievance to a committee of the same Board rather

than to a different decision-maker of the college. *Ricks*, 449 U.S. at 252.   Plaintiff characterizes

the grievance as a request for reconsideration. Pl.'s Resp. 18 (ECF No. 41).  Second, unlike the

*Ricks* plaintiff whose statute of limitations ran from the termination date, in this case Plaintiff's

statutes of limitations ran "from when his employer finally decided in a final, binding and

unappealable way that his application for tenure had been denied ..." Pl.'s Resp. 18 (ECF No.

41).  Specifically, the Plaintiff asks this Court to find that the University President's letter is the

final decision on tenure.

In *Ricks*, the EEOC filed an *amicus* brief contending that the date when Ricks was

notified of the denial of his grievance should be the operative date for computing limitations

periods, because the denial of the grievance was the final tenure decision. *Ricks*, 449 U.S. at 260-

61.  The Supreme Court rejected this argument.  *Id.* at 261.  Although the Board of Trustees'

decision letter "indicated a willingness to change its prior decision if Ricks' grievance were

found to be meritorious[,]" the Supreme Court held that "entertaining a grievance complaining of

the tenure decision does not suggest that the earlier decision was in any respect tentative." *Id.* at

261.  "The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made." *Id.* (emphasis in original).

In *Hoesterey*, the plaintiff challenged a different practice than *Ricks* – Hoestery contested the lack of process accompanying his termination because he received only an oral notification of the termination decision. *Hoesterey*, 945 F.2d at 320.  Based on these facts, the Ninth Circuit applied *Ricks*' analysis and held that "the simple notification that he was being discharged at a later date would not be sufficient to trigger the statute of limitations period." *Id.*  The Ninth Circuit went on to hold that "to trigger the statute of limitations, Hoesterey needed to have received notice, not only of the termination decision, but also that the decision was final and that it would be followed by no further process." *Id.*

The facts here are analogous to those in *Ricks*.  Similar to the Board of Trustees' letter in *Ricks* which indicated a willingness to change its prior decision following a grievance, the Provost's letter references the appeal process provided in the CBA after an unfavorable tenure decision of the Provost. Pl.'s Mot. for Partial Summ. J. Ex. 7 (ECF No. 28-9); Reeves Decl., Ex. 33, 2, Article 21, Section 1. Scope of Article. (ECF No. 31).  While the Provost did not characterize his decision as the University's "official position" as the Board of Trustees' letter in *Ricks* did, the Provost's letter stated that Plaintiff is offered "a one-year, non-renewable contract, expiring June 15, 2017." Pl.'s Mot. for Partial Summ. J. Ex. 7 (ECF No. 28-9).  It was an offer of a "terminal" contract. *See Ricks*, 449 U.S. at 261.  Plaintiff also testified at his deposition that he understood that Provost Coltrane "had the authority – the final say on [his] tenure." Zhang Dep. 112: 7:10 (ECF No. 28-4); Reeves Decl. Zhang Dep. 111:3-10 (ECF No. 31).  Unlike *Hoesterey* where the plaintiff received an oral notification of termination, Plaintiff received a written letter from the Provost.  Furthermore, "the pendency of grievance or some other method of collateral

review of an employment decision, does not toll the running of the limitations periods." *Id.* (citing *Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229 (1976)).

For these reasons, the Court should find that the Provost's decision on May 4, 2016 was the operative date for computing the Title VII statute of limitations, and Plaintiff's discrimination claims under Title VII and ORS 659A are time barred. Accordingly, the Court should grant Defendants' motion on Count I and Count II.

## B. Count I: Title VII and ORS 659A Race and National Origin Discrimination Against the University

To establish a *prima facie* case for employment discrimination based on race, a plaintiff must show that (1) he belongs to a racial minority, (2) he applied and is qualified for a position the employer was seeking, (3) despite his qualifications, he was rejected, and (4) his employer treated him differently than a similarly situated employee not in the same protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once the plaintiff presents evidence sufficient to constitute a *prima facie* case of discrimination, the employer must articulate a legitimate, nondiscriminatory reason for the employer's decision, and then the plaintiff must show that the employer's reason for its decision was a pretext or discriminatory in its application. *Id.* at 807. "In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

Defendants assert that Plaintiff has presented no evidence of discrimination because of his race or national origin. Defs.' Mot. for Summ. J. 23-26 (ECF No. 30). When asked during deposition whether he has any knowledge or any facts that support his "assumption" of being

discriminated because he is Chinese, Plaintiff responded that Chinese origin is the "remaining

reason" because all other reasons are eliminated. Reeves Decl. Ex. 1, 240:4-15 (ECF No. 31). In

particular, Plaintiff stated:

> You know, when this happened, why did you do this? You have -- so if all things
> happens [sic] to me, all these things happen to me, you should think about the
> reason. Why did he do this? Because I'm young? Because I'm -- because I'm 42
> years old? So what's the reason? He made so many requests because I'm from
> Minnesota? Because I'm from Hubei Province? What's the reason? So the only
> reason I can figure out is Chinese origin. You know your mathematics, we call it
> exclusion. If every possibility is included, then the remaining reason is Chinese
> origin.

*Id.*

"To survive summary judgment, a plaintiff must set forth non-speculative evidence of

specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4*

*Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (citation omitted). Plaintiff's conclusion at the

deposition that "the only reason [he] can figure out is Chinese origin" is mere speculation of

Fang's discriminatory motive based on exclusion of an array of other possible reasons. This is

not enough to pass summary judgment. *Id.*

Plaintiff also argues there are additional facts that provide evidentiary support for a

discriminatory motive. For example, he and Fang shared the Chinese culture and Fang treated

Pardoe differently. Pl.'s Resp. 21-22 (ECF No. 41). Plaintiff claims that Fang did not ask Pardoe

for personal favors, did not ask Pardoe to co-author a paper, and did not review Pardoe's tenure

application with the requirements as in Plaintiff's tenure review. *Id.* at 22.

Plaintiff's testimony of the shared Chinese cultural values regarding seniority and status

is insufficient. This testimony does not give rise to a reasonable inference that Fang

discriminated against Plaintiff because Plaintiff is Chinese.

As to Pardoe, Defendants contend that he is not a proper comparator, because he was awarded tenure two years before Plaintiff started working at the University and eight years before he applied for tenure, Fang did not serve on Pardoe's tenure review committee, and Pardoe's reviewers were different from Plaintiff's. Defs.' Reply 11 (ECF No. 43); Fang Decl. ¶ 8 (ECF No. 45).

In the context of tenure decisions, courts of other districts and one circuit have found that comparators are not similarly situated when the tenure reviewers are different. *Martin v. Auburn Univ. Montgomery*, 908 F. Supp. 2d 1259, 1268 (M.D. Ala. 2012) (female faculties were not sufficiently similar to the plaintiff to establish a *prima facie* case of discrimination because they did not share tenure reviewers in common); *Ren v. Univ. of Cent. Fl. Bd. of Trs.*, 390 F. Supp. 2d 1223, 1230 (M.D. Fla. 2005) (male associate professor was not similarly situated because he and plaintiff "held positions in different departments, had different supervisors, [and] were reviewed, at least in part, by different evaluators …"); *Tapp v. St. Louis Univ.*, 78 F. Supp. 2d 1002, 1016 (E.D. Mo. 2000) (finding comparator was not similarly situated where decisions were separated by six years under different deans, and the members of the tenure committee were different); *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994) ("When different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.").  In light of these holdings and the fact that Fang played no role in Pardoe's tenure decision, the Court should find that Pardoe is not a proper comparator.

In addition, to the extent that Plaintiff suggests that Fang influenced the College Committee because Fang is the only statistician on the Department Committee and his opinion carried more weight, Plaintiff offered no evidence that could create a genuine issue of material fact regarding such claimed influence.  *See* Reeves Decl. Ex. 1 Zhang Dep. 267:9-25, 269:1-8

(ECF No. 31); *see also*, Zhang Decl. ¶¶ 10, 11 (ECF No. 41-3).  Plaintiff's testimony quoted

above in this opinion, and for which Plaintiff relies on as proof of Fang's discriminatory conduct,

is in fact devoid of any meaningful connection between Fang's conduct and Plaintiff's failure to

secure tenure.  Additionally, evidence shows that Fang did not try to negatively influence the

Department Committee. Reeves Decl. Ex. 13, Murthy Dep. 72:10-12 (ECF No. 31) (Dr. Murthy

testified that Fang "never had even once [sic] any negative comment …").

When the Court considers all the facts in the light most favorable to Plaintiff, including

evidence relating to Fang's unique requests of Plaintiff over two years before the tenure review

process, there is no material evidence that causally links Fang's treatment of Plaintiff with race

or national origin discrimination that contributed to the ultimate denial of Plaintiff's tenure.

Plaintiff failed to establish a *prima facie* case of discrimination because of race or national

origin.

Defendants also advance the arguments that (1) even if Fang had an improper motive, it

cannot be imputed to the University because Plaintiff failed to show that Fang unduly influenced

the University's decision, (2) the University has a legitimate, non-discriminatory reason for its

decision, and (3) Plaintiff failed to establish pretext. Defs' Mot. for Summ. J. 25-29 (ECF No.

30).  Because the Court should find that Plaintiff failed to establish a *prima facie* case of

discrimination, the Court need not address Defendants' remaining arguments against the Title

VII and ORS 659A discrimination claims in Count I.

The Court should grant Defendants' motion against Count I.

### C. Count II: Title VII and ORS 659A Retaliation Against the University

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) he

engaged in a protected activity, (2) the employer took an adverse employment action against

him, and (3) a causal link exits between the protected activity and the adverse employment

action. *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004).

   Plaintiff claims two protected activities for which he claims the underlying retaliation

against him: his refusal to add Fang's name to his paper and his appeal letter of July 2016 to

Provost Coltrane. Pl.'s Resp. to Defs.' Mot. for Summ. J. 27 (ECF No. 41).  Defendants respond

that neither of the claimed activities is a protected activity, and Plaintiff cannot establish a causal

link. Defs.' Mot. for Summ. J. 29-30 (ECF No. 30).

   Defendants explain that Plaintiff never filed a grievance alleging discrimination and

never reported discrimination to anyone before he was denied tenure despite his knowledge of

the CBA's discrimination grievance procedure. Defs.' Mot. for Summ. J. 29-30 (ECF No. 30).

The first time Plaintiff mentioned "discrimination" was in his appeal letter to the Provost, but he

did not mention race or national origin discrimination, let alone Fang's purported discrimination

against him. *Id.* at 30.  The appeal letter was submitted a year after the Provost denied tenure. *Id.*

Additionally, with the lapse of more than two years between Plaintiff's refusal to add Fang's

name and the adverse tenure decision, Defendants assert that it is too long to establish causation.

*Id.* at 30-31 (citing *Clark Ct. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (20 months

between the protected activity and the adverse employment action suggests "no causality at all");

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (18-month lapse "is

simply too long")); Defs.' Reply 23 (ECF No. 43) (citing *Vimegnon v. Oregon Health and

Science University*, No. 3:16-CV-02304-HZ, 2017 WL 3429394, *7 (D. Or. Aug. 8, 2017)

(holding that "[a]" time lag of two years is too long to raise an inference of causation.")).

   The Ninth Circuit recognizes that "[w]hen an employee reasonably believes that

discrimination exists, opposition thereto is opposition to an employment practice made unlawful

by Title VII even if the employee turns out to be mistaken as to the facts." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978).  For purposes of summary judgment, even if the Court were to find that Plaintiff reasonably perceived Fang's request to be a discriminatory employment practice and that his refusal to add Fang's name to his paper is a protected activity, Plaintiff fails to establish causation for this purported protected activity.  The Supreme Court has made it clear that "the temporal proximity must be 'very close' " "as sufficient evidence of causality to establish a *prima facie* case[.]" *Breeden*, 532 U.S. at 273. "Action taken … 20 months later suggests, by itself, no causality at all." *Id.*  Here, between Plaintiff's rejection of Fang's request in June 2013 and the Department Committee's adverse decision letter in December 2015, 30 months have passed. Zhang Dep. 212: 12-215:24 (ECF No. 28-4); Pl.'s Mot. for Partial Summ. J. Ex. 1 (ECF No. 28-3).  Plaintiff has not proffered any evidence that in this 30-month interim, Fang discriminated or retaliated against Plaintiff for Plaintiff's refusal to co-author a paper.  Too much time has passed to meet the "very close" requirement for the temporal proximity. *See Breeden*, 532 U.S. at 273.

As to Plaintiff's appeal letter to the Provost, Defendants argue that it is not a protected activity because it was a year after the Provost's denial of tenure. Defs.' Reply 23-24 (ECF No. 43).  As discussed above, the Provost's unfavorable tenure decision is the unlawful employment practice that Plaintiff challenges.  Thus, Plaintiff's appeal letter reporting discrimination after the occurrence of the challenged practice cannot have caused the challenged practice.  The Court should find that Plaintiff failed to establish a *prima facie* case of retaliation.  Defendants' motion against Count II should be granted.

**D. Count III: 42 USC § 1981 and § 1983 Race and National Origin Discrimination Against the University and Fang**

1. Immunity for the University

To establish the University's violation of § 1983, Plaintiff must establish "(1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Id.* at 31 (citing *Chudacoff v. Univ. Med. Ctr. Of S. Nevada*, 649 F.3d 1143, 1149 (9th Cir. 2011).

Defendants argue that the University is not a "person" under § 1983 because it is an "arm of the state" under the Eleventh Amendment. Defs.' Mot. for Summ. J. 31 (ECF No. 30) (citing *Will v. Michigan Dep't of State*, 491 U.S. 58, 70 (1989) ("States or governmental entities that are considered 'arms of the state' for Eleventh Amendment purposes" are outside the scope of § 1983)). The Ninth Circuit has held that the University is an "arm of the state" for the Eleventh Amendment purposes, the University is immune from suits under § 1983. *Id.* (citing *Rounds v. Oregon State Bd. Of Higher Educ.*, 166 F.3d 1032, 1035 (9th Cir. 1999); *See, e.g.*, *Hariri v. Portland State Univ.*, No. 3:15-CV-1076PK, 2017 WL 826961, *11 (D. Or. Mar. 2, 2017), *aff'd*, No. 17-35280, 2018 WL 5098830 (9th Cir. Oct. 18, 2018 (Portland State University is [an] "arm of the state" and immune from § 1983 suit)). For the same reason, Defendants argue that the University is immune under § 1981. *Id.* at 32 (citing *Pittman v. Oregon, Employment Dept.*, 509 F.3d 1065, 1071(9th Cir. 2007)).

Plaintiff concedes that the University is immune from paying money damages under §§ 1981 and 1983. Pl.'s Resp. to Defs.' Mot. for Summ. J. 29 (ECF No. 41). The Court should find that the University is entitled to immunity under §§ 1981 and 1983.

2. Immunity for Fang

Defendants agree with Plaintiff that a University official can be sued in his or her official capacity for prospective injunctive relief. Pl.'s Resp. to Defs.' Mot. for Summ. J. 29 (ECF No. 41); Defs' Reply 24, n. 8 (ECF No. 43). Nonetheless, Defendants assert qualified immunity for Fang on both § 1981 and § 1983 claims. *Id.* at 24-27.

Qualified immunity "shield[s] government officials performing discretionary functions from exposure to damages liability unless their conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Anderson v. Creighton*, 483 U.S. 635, 648 (1987). Qualified immunity is designed to "provide ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 230 (2009). The query is whether the defendant should have known at the time of the alleged actions that such actions violate the clearly established right. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 743 (2011).

Section 1981 only applies to race-based discrimination. *Runyon v. McCrary*, 427 U.S. 160, 168 (1976). A *prima facie* case of racial discrimination brought under section 1981 requires proof of intentional discrimination. *Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 537 (9th Cir. 1982). "The plaintiff's immediate burden of production may be discharged by proof of the four elements articulated in *McDonnell Douglas* … or by an alternative presentation of evidence supporting an inference of discrimination." *Id.* at 538.

"To sustain a § 1983 civil rights action, plaintiff must show: (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that [such] conduct deprived the plaintiff of a *federal constitutional or statutory right*." *Lewis v. Sacramento Co.*, 98 F.3d 434, 438 (9th Cir 1996) (emphasis supplied); *Franklin v. Terr*, 201 F.3d 1098, 1100 (9th Cir 2000).

Defendants contend that Plaintiff cannot establish that Fang was on notice that the activities Fang engaged in constituted intentional discrimination under "clearly established" law. Defs.' Reply 26-27 (ECF No. 43). As discussed above, Plaintiff's evidentiary support for his Title VII and Oregon discrimination and retaliation claims is insufficient to survive summary judgment. Accordingly, Plaintiff's right at issue was not clearly established. The Court should find that Fang is entitled to qualified immunity for the §§ 1981 and 1983 claims and grant Defendants' motion against Count III.

### E. Count IV: Whistleblower Retaliation Against the University

In the complaint, Plaintiff alleges whistle blower retaliation against the University. First Am. Compl. ¶¶ 155-61 (ECF No. 11). In his response to Defendants' Motion for Summary Judgment, Plaintiff withdrew Count IV. Pl.'s Resp. 33 (ECF No. 41). The Court should deny Defendants' motion against Count IV as moot.

### F. Count V: Breach of Contract Against the University

"To state a claim for breach of contract, plaintiff must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff." *Slover v. Oregon State Bd. Of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996). Plaintiff alleges that "[t]he Reappointment Letter issued on or about April 23, 2014 constitutes a valid and enforceable employment contract between Zhang and the

University." First Am. Compl. ¶ 163 (ECF No. 29). He alleges that he fulfilled the expectations required of him by the contract, but the University breached the employment contract between him and the University. First Am. Compl. ¶¶ 164-65 (ECF No. 11). However, Plaintiff concedes in response to Defendants' motion that Plaintiff's employment is governed by his employment contracts and is not governed by his April 23, 2014 Reappointment Letter. Pl.'s Resp. to Defs.' Mot for Summ. J. 33 (ECF No. 41). Based on Plaintiff's concession, Defendants argue that the breach of contract claim should be dismissed because the Reappointment Letter has no bearing on Plaintiff's employment with the University. Defs.' Reply 28 (ECF No. 43).

To the extent Plaintiff's claim is based on his employment contract, Defendants assert that Plaintiff's breach of contract claim fails because the employment contract is not related to tenure decisions. *Id.* Additionally, because Plaintiff failed to report the discrimination, he cannot succeed in his breach of contract claim. Defs.' Mot. for Summ. J. 37-38 (citing *Slover v. Oregon State Bd. Of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996) (plaintiff must demonstrate full performance to succeed on breach of contract claim)). Defendants contend that Plaintiff's July 2016 letter to the Provost was not a report of discrimination because he did not mention race or national origin but only focused on his perception of an unfair evaluation. Defs.' Reply 28 (ECF No. 43). Furthermore, Plaintiff's tenure was denied by the Provost on May 4, 2016, prior to Plaintiff's letter that allegedly reported discrimination. *Id.*

Plaintiff denies breach on his part and claims that he "did report discrimination to the Provost in July of 2016." Pl.'s Resp. 33 (ECF No. 41). Plaintiff argues that the breach occurred when the University President decided in January 2017 not to grant tenure to Plaintiff. *Id.*

Plaintiff's argument lacks merit. Plaintiff alleges three events as the basis for the breach: the University breached the contract by "[f]ailing to grant a favorable tenure decision …;"

"[s]ubjecting Zhang's publication history to a new journal ranking criteria not present in the contract; and [s]ubjecting Zhang's tenure application to 'cohort analysis' not present in the contract." First Am. Compl. ¶ 165 (ECF No. 11).  All three breaching events occurred after Fang's alleged discriminatory acts towards Plaintiff, with the tenure denial being the last in time. As explained above, the University denied Plaintiff's tenure when the Provost decided not to grant his tenure.  Therefore, the last alleged breaching event is the Provost's denial of tenure. Plaintiff's only evidentiary support for his report of Fang's discriminatory acts is his appeal letter to the Provost. *See* Pl.'s Resp. 33 (ECF No. 41).  Assuming Plaintiff's appeal letter to the Provost is a report of discrimination for purposes of summary judgment, because Plaintiff reported discrimination after all three breaching events, he has not produced evidence that he fully performed his contractual obligations to report discrimination prior to the alleged breaching events.  The Court should grant Defendants' motion for summary judgment against the breach of contract claim. *See Slover*, 144 Or. App. at 570.

## II. Plaintiff's Motion for Partial Summary Judgment

Because this Court should grant Defendants' Motion for Summary Judgment, Plaintiff's Motion for Partial Summary Judgment should be denied as moot.

## RECOMMENDATION

Defendants' Motion for Judgment should be GRANTED in part as to Count I, Count II, Count III, and Count V, and DENIED in part as to Count IV as moot.  Plaintiff's Motion for Partial Summary Judgment should be DENIED as moot.  The Complaint should be dismissed.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The

parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to *de novo* consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

      DATED this 11th day of October, 2019.


      s/Mustafa T. Kasubhai\
      Mustafa T. Kasubhai\
      United States Magistrate Judge